No. 18,855.

METROPOLITAN SUBURBAN WATER USERS ASSOCIATION,
ET AL. *v.* COLORADO RIVER WATER CONSERVATION DISTRICT,
ET AL.

(365 P. [2d] 273)

Decided October 2, 1961.   October 23, 1961, Opinion modified and
petitions for rehearing denied.

174

Mr. KARL C. BRAUNS, Mr. LESLIE A. GIFFORD, Mr. F. T. HENRY, Messrs. GRANT, SHAFROTH, TOLL, CHILSON and MCHENDRIE, for plaintiffs in error.

Messrs. BARNARD and BARNARD, for defendant in error The Colorado River Conservation District.

Messrs. PRESTON and ALTMAN, for defendant in error Pueblo, and the Board of Water Works of Pueblo.

Mr. GLENN G. SAUNDERS, Mr. JACK ROSS, Mr. JOHN P. AKOLT, Mr. ROBERT A. DICK, Mr. JOHN M. DICKSON, for

176

defendant in error The City and County of Denver and Board of Water Commissioners of Denver.

Mr. JOHN J. ATKINSON, Mr. CHARLES E. LEIERER, for defendant in error Paul M. Rice.

*En Banc.*

MR. CHIEF JUSTICE HALL delivered the opinion of the Court.

IN this opinion we will refer to the parties as follows: The Metropolitan Suburban Water Users Association as the ASSOCIATION; the City of Colorado Springs, Colorado, as COLORADO SPRINGS; the City of Aurora, Colorado, as AURORA; the Colorado River Water Conservation District as the DISTRICT; the Board of Water Commissioners of Pueblo, Colorado, successor to the Trustees of the Pueblo Water Works, as PUEBLO; the City and County of Denver, acting by and through its Board of Water Commissioners, as DENVER, and to Paul M. Rice as RICE.

On May 29, 1956, the Association, Colorado Springs and Aurora filed in the District Court of Eagle County their petition in this supplemental general water adjudication proceeding in Water District No. 37 of the state of Colorado, setting forth that they are the owners and claimants of unadjudicated water rights in said District. They pray that the court proceed to determine and adjudicate the rights of all parties to the use of water in said district.

Proper notice was given to all parties in interest. None of the holders of adjudicated rights appeared.

*On September 15, 1956,* the Association filed its statement of claims in its own behalf and in behalf of Colorado Springs and Aurora: "and such other entities and persons as may use the waters diverted by virtue of the water rights to which claim is hereby made."

In its claim the Association asserts appropriative rights to waters to be diverted from specified tributaries of the Eagle River, which river drains a portion of Colorado lying west of the Continental Divide, to be diverted, transported, stored and delivered into the Arkansas River Basin, which drains a portion of Colorado lying east of the Continental Divide. Diversion, storage and delivery are to be accomplished by and through the following facilities:

A. Homestake Conduit; B. East Fork Conduit; C. Homestake Tunnel; D. Homestake Reservoir, *also known as* Elliott Weers Reservoir; E. Eagle-Arkansas Ditch.

The claim further states that after reaching the Arkansas Basin a portion of the total waters diverted is to be transported from the Arkansas River Basin (probably over Trout Creek Pass) into the South Platte River Basin, thus making waters so diverted, stored and transported available for use and consumption in Colorado Springs and other areas in the Arkansas River Basin; and in Aurora, and other areas in the South Platte River Basin in the vicinity of Denver. It is proposed that the water will be used for any and all beneficial uses to which water may be applied.

The Association seeks a decree for diversion from twelve named tributaries of the Eagle River of a total of 1840 second feet, diversion to be made by the Homestake Conduit, which conduit has a total length of 23.40 miles and has a maximum carrying capacity of 1530 second feet at its lower end, of which amount proposed to be diverted only 750 feet (the capacity of the Homestake Tunnel) will at any one time be transported from the various points of diversion to the Arkansas River Basin, the excess of 750 feet diverted at any one time by the Homestake Conduit to be stored in the Homestake Reservoir. Claim is also made for 260 second feet for the East Fork Conduit, said water to be diverted from the East Fork of Homestake Creek and transported into the Homestake Reservoir, there to be stored or from there to

be transported through the Homestake Tunnel. Claim is also made for 300 second feet for the Homestake Tunnel, the water to be diverted from the Middle Fork of Homestake Creek and by means of said tunnel transported to the Arkansas River Basin; claim is also made for 10 second feet of water seeping and percolating into the Homestake Tunnel through its entire length (about 5½ miles). Claim is also made for 530 second feet for the Eagle-Arkansas Ditch, said water to be diverted from seven named tributaries of the Eagle River, thence to be transported through the Tennessee Pass Tunnel and then to join the waters emerging from the Homestake Tunnel in the Arkansas River Basin. Claim is also made for appropriations of water for storage in Homestake Reservoir with its dam across Homestake Creek at all times to its full capacity of 126,843.68 acre feet. The sources of supply for such storage being waters diverted by the Homestake Conduit and East Fork Conduit, together with 1500 second feet, the maximum flow of Homestake Creek at said dam site.

The petition alleges that commencement of physical construction of the facilities which initiated their appropriation for each facility was September 22, 1952, and sets forth in detail the anticipated capacities of the various diversions, storage and delivery facilities, and, as further evidence of having initiated appropriations of the waters described therein and for which claim and adjudication is sought, alleges numerous filings of original maps, enlargements thereof, and other data in the office of the state engineer, during the period September 8, 1953, to March 6, 1956. The Association asks for a conditional decree fixing the amounts of water it is entitled to divert and store and the dates thereof.

*On November 14, 1956,* the District filed its statement of claim for the so-called Red Cliff Project, consisting of a system of reservoirs, ditches, power conduits and other facilities designed to divert, impound and deliver for beneficial use waters of the Eagle River, and three tribu-

taries thereof, viz: Homestake Creek, Petersen Creek and Fall Creek.

It is alleged that the Red Cliff Project consists of:

(1) Iron Mountain Reservoir, an on-stream structure located on Homestake Creek (one-third mile upstream from its confluence with the Eagle River and some ten miles down stream from the Association's projected Homestake Reservoir) to be used to impound the waters thereof as well as waters diverted from the Eagle River through the Pando Feeder Canal;

(2) Pando Feeder Canal, designed to divert water from the Eagle River, to then be conveyed into an unnamed creek tributary to Homestake Creek and from there into the Iron Mountain Reservoir;

(3) Gilman Power Conduit designed to divert and collect waters from: (a) Iron Mountain Reservoir; (b) Petersen Creek, a tributary of the Eagle River, and (c) Fall Creek, another tributary of the Eagle River.

Said waters, collected in the conduit, to be used to generate power at the Gilman Power Plant located on the Eagle River, about four miles downstream from the Iron Mountain Reservoir, and after passing through the power unit to tail into the Eagle River. As a part of the over-all project it is contemplated that the tailed water from the Gilman Power Plant be diverted from the Colorado River, some ninety miles down stream, for irrigation of lands of the Bluestone Unit of the Cliffs-Divide Project.

The District seeks to be awarded priorities for diversion, storage and beneficial use of water in the following amounts:

(1) for storage in Iron Mountain Reservoir 68,042.72 acre feet; (2) 500 cubic feet of water per second of time to be diverted by the Pando Feeder Canal; (3) 250 cubic feet of water per second of time to be diverted from the Iron Mountain Reservoir through the Gilman Power Conduit; (4) 100 cubic feet of water per second of time to be diverted through the Petersen Creek Feeder Con-

duit, and (5) 250 cubic feet of water per second of time to be diverted through the Fall Creek Feeder Conduit.

Work on said project was commenced by survey on August 10, 1956.

A map and statement of the project was filed in the office of the state engineer on October 5, 1956. The District claims the aforesaid appropriations were initiated on August 10, 1956.

*On January 28, 1957,* Denver filed herein its statement of claim under the title "Roberts Tunnel Collection System," the portion thereof located in Water District No. 37 consisting of a series of conduits and tunnels extending from Red Sandstone Creek southward across eighteen intervening creeks and streams tributary to the Eagle River. From these sources, at an elevation of about 9284 feet, Denver proposes to divert 1195 cubic feet of water per second of time, the same to be transported from the Eagle River watershed by means of the Vail Pass Tunnel and there discharged into Ten Mile Creek, a tributary of the Blue River, the same to flow through and along Ten Mile Creek to the Dillon Dam, located on the Blue River, to be there stored or permitted to flow from thence under the Continental Divide by means of the Harold D. Roberts Tunnel into the North Fork of the South Platte River, thereafter said waters to be stored in or transported through the Two Forks Reservoir, proposed to be constructed on the South Platte River downstream from its confluence with the North Fork of said river, or stored in the Marston Reservoir (part of Denver's present storage system) and, by exchange of waters of the South Platte, Cheesman Reservoir, Eleven Mile Canon Reservoir and Antero Reservoir, and from thence into Denver's distribution system for multiple uses, including all municipal uses, power and irrigation, the areas to be irrigated being within the territorial limits of Denver or adjacent thereto, and so located that the prosperity or welfare of Denver is dependent upon their irrigation.

Denver seeks priorities as of date November 7, 1956, the date of alleged commencement of survey. Filings for the project designated as the Roberts Tunnel Collection System were lodged with the state engineer December 28, 1956, and were by him accepted and filed January 24, 1957. Denver seeks decrees for 1195 cubic feet of water per second of time direct flow from tributaries of the Eagle River, together with storage rights in the following amounts:

Dillon Reservoir — 252,678 acre feet; Twin Forks Reservoir — 600,000 acre feet; Marston Reservoir — 17,853 acre feet (additional).

None of the three above-mentioned reservoirs is located or to be located in Water District No. 37.

*On September 24, 1956,* Pueblo filed its claim for the Otero Tennessee Pass Ditch designed to carry water to be diverted from the following named tributaries of the Eagle River: Jones Gulch, Fiddler Creek, Taylor Gulch, Piney Creek, and from the slopes draining into such ditch. Water collected in said ditch is to be transported to the Arkansas River, and thence to Pueblo for municipal purposes. The trial court awarded to Pueblo a conditional decree in Water District No. 37, priority No. 542, for 144 cubic feet of water per second of time as of date July 12, 1955. Neither Pueblo nor any other party hereto objected to this conditional decree and the same is not before us for review; we shall not comment thereon other than to observe that Pueblo's claim was no better than the claims of some others which were denied.

*On January 13, 1958,* Paul M. Rice, by leave of court, filed his belated statement of claim. He alleges ownership of the French Creek Placer Survey No. 2017, consisting of 27.88 acres, title to which he acquired August 13, 1953. He seeks an absolute decree for 0.5 cubic feet of water per second of time for domestic use and a conditional decree for 5.0 cubic feet of water per second of time for proposed mining and industrial use. Rice has filed no statement or map with the state engineer.

There were no protests or objections filed to any of these claims by any adjudicated owner of or claimant, other than the parties hereto, to any of the waters of the Eagle River or any of its tributaries. There were objections and protests among the foregoing claimants.

The District filed its protest and objections to the granting of any decree to the Association, urging as reasons therefor that:

(1) it seeks waters for purely speculative, indefinite and unknown purposes; (2) waters percolating into the Homestake Tunnel are not tributary to the Eagle River and are therefor not in Water District No. 37 or subject to adjudication herein; (3) maps and statement of claims were not filed in the office of the state engineer within sixty days of the commencement of construction of said project, therefore it is not entitled to any priority date.

The District also filed its protest and objections to the claim of Denver, urging that:

(1) Denver's claim for 1195 cubic feet of water per second of time is for an amount in excess of any amount that Denver could put to reasonable use; (2) Denver already has ample water for its present and reasonably anticipated future needs; (3) the claim for water for irrigation of lands beyond the territorial limits of Denver is: (a) speculative and not based on any reasonably anticipated need therefor, and (b) beyond the constitutional or statutory powers of Denver; (4) Denver is seeking to reserve waters for future use as distinguished from present or reasonably anticipated need; (5) Denver has made no surveys or done any construction work on its Roberts Tunnel Collection System and therefore has acquired no right to a priority date or decree.

The District also filed its motion to dismiss Denver's claim for the following reasons:

I. Said statement does not allege facts sufficient to warrant the granting to Denver of any decree, conditional or otherwise.

II. (1) Insufficiency of the evidence to warrant the

granting of any decree in that said evidence fails to show: (a) that any points of proposed diversion have been established; (b) that anything has been done by Denver to establish any priority date; (c) the amount of water to be diverted from each of the sources mentioned in said claim;

(2) No survey for the Roberts Tunnel Collection System has ever been made.

(3) The map filed by Denver is one made by the Bureau of Reclamation prior to the year 1948, and the same cannot be made the basis for an award of any decree.

(4) Denver has no present fixed or definite intention to divert any water by means of the project, but only seeks to reserve the water for some future speculative use.

(5) Denver proposes to use the water for irrigation beyond its boundaries and beyond its authority and has failed to show the number of acres and the location thereof proposed to be irrigated.

The Association filed its protest and objections to the claim of Denver, urging that Denver's claim is junior to the claim of the Association (this is manifest from Denver's claim). It also filed its protest and objections to the claim of Rice.

Testimony was taken on several occasions during the interval September 9, 1956, to and including January 13, 1958.

On February 19, 1958, the court entered and submitted FINDINGS wherein Pueblo was granted District Priority No. 542 for 144 cubic feet of water per second of time as of July 12, 1955. The claims of the Association, the District, Denver and Rice were all denied because of lack of proof to justify the entry of any decree in favor of any claimant.

The Association, the District, Denver and Rice all promptly filed exceptions to the foregoing findings each urging that they had filed statements of claim setting

forth facts required to be stated to become entitled to conditional decrees and had offered evidence to establish their claimed rights to the conditional decrees requested.

Hearing was held on these exceptions on April 3, 1958, and an order amending the findings was entered June 14, 1958, which findings, though more detailed, came to the same result — denial of all claims except that of Pueblo.

With reference to the Association's statement of claims, the court found that:

1. The date of initiation of the appropriation for Homestake Conduit, East Fork Conduit, Homestake Tunnel and Homestake Reservoir was September 5, 1956.

2. The Association has exercised due diligence insofar as the diversion of water through Homestake Tunnel is concerned.

3. The claim for the Eagle-Arkansas Ditch is a separate and distinct project from claimant's Homestake project and that the two projects "are not in any manner or particular, physically connected or related in Water District No. 37"; that there was no evidence to invoke the doctrine of relation back, and no diligence.

4. (a) Colorado Springs has an ample supply of water for its present needs and for a reasonable time in the future; (b) Aurora has an ample supply of water to meet its needs prior to the year 1965, at which time Denver will have ample decreed water available to supply the metropolitan area of Denver, including Aurora; (c) no other need for water has been shown by the association.

5. The whole project as planned is speculative.

6. Colorado Springs and Aurora have no fixed intention to take or use any of the water sought.

7. The evidence presented does not warrant the granting of any decree to the Association.

With reference to the claim of Denver for the Roberts Tunnel Collection System, the court found that:

1. The date of initiation for the appropriation is claimed as November 7, 1956.

2. The claimed capacity of 1195 cubic feet of water per second of time was not proved.

3. Due and reasonable diligence has not been shown.

4. Denver has an ample supply of water for its present needs and any needs that may exist "prior to the completion of its Blue River Project at which time it will have an adequate supply for a reasonable time in the future."

5. No survey of the system has been made in Water District No. 37.

6. The map and statement filed with and accepted by the state engineer are too indefinite and uncertain upon which to base any decree.

7. The proposed points of diversion are not fixed or known.

8. The entire claimed project as conceived and planned is speculative.

9. The financing and construction of said project is uncertain.

10. The evidence presented does not warrant the granting of any decree to Denver.

With reference to the claim of the District for its Red Cliff Project, the court found that:

1. The date of the initiation of the original appropriation of water for the project is August 10, 1956.

2. Due and reasonable diligence has not been shown.

3. There is no evidence to warrant invoking the doctrine of relation back.

4. The entire project as conceived and planned is speculative.

5. The financing and construction of said project is uncertain.

6. There is no proof of need for the waters sought.

7. The evidence presented does not warrant the granting of any decree to the District.

With reference to the claim of Rice for the French Creek Diversion, the court found that:

1. No map or statement has been filed with the state engineer.

2. The claimed date of the initiation of the original appropriation is August 13, 1953.

3. No survey of the proposed project has been made.

4. There is no evidence to warrant invoking of the doctrine of relation back.

5. The entire project as conceived and planned is speculative.

6. The evidence presented does not warrant the granting of any decree to Rice.

To the findings as amended, the Association, Denver, the District and Rice all filed objections and exceptions of the same general tenor, pointing out that such findings are contrary to the evidence, contrary to the Constitution and statutes of the state of Colorado, and have the effect of denying to claimants their right to appropriate and put to beneficial use unappropriated waters of the state of Colorado.

The Association asserted the further objections: (a) that the date of the initiation of their appropriation was September 22, 1952, not September 6, 1956, as found by the court; (b) that the Eagle-Arkansas Ditch is an integral part of the Homestake Project; (c) that the finding of the court granting a priority to Pueblo is at variance and inconsistent with its finding that the Association is entitled to no priority.

On July 8, 1958, the foregoing objections were all overruled and the District's motion to dismiss Denver's claim denied. Motion for new trial was dispensed with.

On July 23, 1958, final decree was entered denying the claims of the Association, Denver, the District and Rice, all of whom are here by writ of error seeking to have their own claims allowed. The District also seeks to have the court's order denying Denver's claim affirmed.

It may seem trite to again point out that the people of the state of Colorado, in 1876, in adopting the Constitution, saw fit to insert therein meaningful provisions with

reference to the waters of the state and usage to be made thereof.

Article XVI, Sec. 5, Constitution of Colorado:

"The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided."

Article XVI, Sec. 6, Constitution of Colorado:

"The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose; but when the waters of any natural stream are not sufficient for the service of all those desiring the use of the same, those using the water for domestic purposes shall have the preference over those claiming for any other purpose, and those using the water for agricultural purposes shall have preference over those using the same for manufacturing purposes."

It will be noted that *all* waters of natural streams, not then appropriated, are declared to be public property and subject to appropriation.

Section 6, supra, expressly provides that:

"The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. * * *."

Each of the claimants has expressed a desire and intention to divert and put to beneficial use waters of the Eagle River. All claims except that of Pueblo have been denied.

Water is indispensable to man. Demands of an expanding population with its increased consumption are ever growing, and the available supply is more and more in demand. The cost of making water available, which at the time of the adoption of the Constitution — eighty-five years ago — would have been considered prohibitive, is now acceptable. Likewise, engineering and construc-

tion problems which in those days would have been considered speculative, fantastic and impossible, are today commonplace.

Constitutional provisions, implementing statutes, and decisions of this court, all recognize the great public and private benefits which emanate from conserving and putting to beneficial use, at the earliest practical time, all of the waters of the natural streams of the state of Colorado.

With reference to the claim of the Association, the trial judge (proceeding on the theory that the Homestake Project and the Eagle-Arkansas Ditch are separate and distinct projects) found that appropriation for the Homestake Project had been initiated September 5, 1956, and that claimants had "exercised due and reasonable diligence insofar as the diversion of water through what is known as Homestake Tunnel is concerned."

In finding "reasonable diligence" apparently the trial judge concluded that the Association had brought itself within the terms of C.R.S. '53, 147-10-6, which provides:

"Each claimant for appropriation of water within said water district, whether said appropriation shall have been wholly or partially completed, and though no filing shall have been made in the office of the state engineer, shall appear at said general adjudication proceedings and file his statement of claim and offer proof in support thereof before the district court, or the referee appointed for such purpose, and claims and proofs with respect to partially completed or perfected appropriations shall be presented in the same manner as the claims and proofs for completed and perfected appropriations. The court and referee shall receive and consider all such claims and proofs and *if it shall appear that any claimant at said proceedings, or his predecessors in title and claim, has prosecuted his claims of appropriation and the financing and construction of his enterprise with reasonable diligence under all the facts and circumstances surrounding and bearing upon such claim of appropriation,* the dis-

trict court shall enter a decree fixing and determining the priority of right of each such partially completed appropriation as of the date from which such reasonable diligence shall be shown to have been exercised, and fixing the maximum amount of water which such claimant shall be entitled to divert under said priority for the purpose of perfecting his said appropriation * * *." (Emphasis supplied.)

█ Having made findings that an appropriation had been initiated followed by due diligence, it was incumbent upon the court to enter a conditional decree in accord with the mandate of the statute.

With reference to that portion of the Association's claim described as the Eagle-Arkansas Ditch, the trial judge made no finding as to whether claimant had initiated an appropriation for this portion of its claim, but did expressly find:

" * * * due and reasonable diligence had not been shown insofar as the diversion of water through what is known as the Eagle-Arkansas Ditch and extension and enlargment and what is known as the Tennessee Pass Tunnel is concerned."

Presumably the trial judge overlooked the necessity of making a finding that the necessary first step initiating an appropriation leading to any decree had or had not been taken. Without having taken this "first step" there can be neither diligence nor lack thereof. The trial court did find lack of diligence, consequently must have concluded, as the evidence clearly demanded, that an appropriation had been initiated.

There can be no doubt from the record before us that the Association did initiate an appropriation for the Eagle-Arkansas Ditch, and this is true whether we consider it as an integral part of the over-all project of claimant, or as a separate project. If it is part of the over-all project, then the court's finding that an appropriation was initiated September 5, 1956, and that due diligence has been exercised, applies to the whole proj-

ect, including the Eagle-Arkansas Ditch. If it is considered as a separate project, then the evidence is uncontradicted that survey of the project was commenced September 22, 1952, and thereafter field engineering work had continued each year during the short season of the year when weather conditions permit such work, and office engineering work was pursued during the winter months. A detailed map of this portion of the project was filed September 8, 1953, and further map showing the extension and enlargement thereof was filed on March 2, 1956. Thus it is apparent that by any test an appropriation for Eagle-Arkansas Ditch had been initiated long prior to the trial court's findings which omitted this item.

From the record before us we find it impossible to reconcile the court's finding that due diligence had been exercised with reference to the Homestake portion of the project, but not with reference to Eagle-Arkansas. The Association at all times considered the Homestake project and the Eagle-Arkansas as one project designed to bring water from the Western Slope to the Arkansas River Basin. Surveys had been initiated on both at the same time and had been continued and maps with detailed locations of the component parts of the project were filed with and accepted by the state engineer. Negotiations were had with Federal agencies for permits to construct the contemplated facilities on and across Federal lands; permission was acquired from the D. & R. G. W. Railroad for use of the Tennessee Pass Tunnel and work in repairing the tunnel had been started. Test holes had been drilled and other geologic work in connection with the Homestake Tunnel had been done and a contract for the actual construction of the tunnel had been negotiated and construction was proceeding thereon. Negotiations for the use of water and for financing covered the Homestake project as a whole, including the Eagle-Arkansas part which the trial judge concluded was a separate project. The uncontradicted evidence

shows that equal diligence has been exercised with reference to the Eagle-Arkansas portion of the project, and the finding of the trial court to the contrary is unsupported by any evidence and is contrary to the undisputed evidence disclosed by the record before us.

Whether we consider the Association's claims to be for one or two projects is quite immaterial. If it is one project, then only one priority should be granted related back to September 22, 1952, the date of commencement of the original survey. If Eagle-Arkansas is a separate project, then its priority should relate back to the same date. This date antedates the dates on which Pueblo, the District, Denver and Rice claim to have initiated their priorities; hence the question is of academic interest only. The uncontradicted evidence dictates the conclusion that the Association's claim is for one priority and that the Homestake Project and Eagle-Arkansas River project constitute one over-all integral plan for the diversion of water from tributaries of one stream and one water basin in one water district. We attach no significance to the fact that the waters do not merge until they leave the district.

The Association offered voluminous and largely uncontradicted evidence of present and future needs for the waters proposed to be diverted and impounded, engineering and construction feasibility and proposed financing. The findings of the trial judge that no need for water was shown and that the entire project as conceived is entirely speculative and that the Association is simply seeking to reserve to itself the amount of water claimed for an unreasonable length of time is contrary to and finds no support in the record before us.

According to the record before us, Aurora's owned water supply is wholly inadequate to meet its present needs, most of which are being supplied on a year-to-year basis by Denver. Denver can at any time refuse to renew its one-year contract and can, even during the term of its contract, limit Aurora's supply if needed in

Denver. Aurora is at the mercy of Denver for its present water needs. Testimony as to its probable enhanced future needs due to population growth and increased per capita uses is convincing and uncontradicted.

It is true that evidence with reference to the water needs of Colorado Springs does not disclose as bleak a picture as that of Aurora. However, it does disclose good reason for adding to its supply to guard against shortages arising in dry years and in contemplation of increased future needs.

All of the witnesses agreed that in planning for a reasonable municipal water supply, provision should be made for an adequate supply in years of minimum run-off and maximum consumption — such as the year 1954 when shortages made imperative imposition of severe restrictions on the use of water by both cities, as well as by other municipalities. In addition to the needs of Colorado Springs and Aurora, the record shows, and without contradiction, that numerous small municipalities and water companies around Denver need, and are interested in acquiring, additional water. Clearly a finding of lack of need cannot stand in the face of this record. Such finding is not supported by any evidence. Colorado Springs and Aurora have each advanced $62,500.00 to the Association looking to the acquisition of additional water. The Association has during the years 1952 to 1956 expended more than $60,000.00 on the over-all project. Such expenditures indicate a good faith effort to appropriate and put to beneficial use unappropriated waters of the state of Colorado. Such constitutional rights cannot be denied.

It must be remembered that claimants seek only a conditional decree. The proposed project will take several years to complete. The trial court in denying each claim found that the claimant was seeking: " * * * to reserve the amount of water claimed for an unreasonable time in the future, * * *." and apparently was greatly influenced by what it assumed to be a speculative

and indefinite purpose. We think its expressed apprehension is ill founded. The legislature provided ample safeguards to prevent any such sinister purpose from bearing fruit by providing that each two years the holder of a conditional decree must go before the court granting the decree and prove reasonable diligence. If on any such occasion it were shown that reasonable diligence to apply the claimed water to beneficial use had not been pursued, it would be the duty of the trial court to cancel the decree. Though claimants may seek to reserve the claimed water for an unreasonable time, their efforts so to do must fail if the trial court each even numbered year performs it duties, as provided by C.R.S. '53, 147-10-8:

"The day of the opening of the first term of said district court in every even numbered year after the year of entry of said decree in said general adjudication proceeding shall be adjudication day for the hearing of further proof in support of any appropriation so granted conditional decree in said general adjudication and for the purpose of permitting such claimant to show reasonable diligence in the prosecution of the completion of said appropriation, * * *. At the conclusion of such hearings * * * *the district court shall cancel in whole or in part the conditional decrees of all claims for appropriation where, under all the facts and circumstances concerning each enterprise, reasonable diligence or progress has not been shown in the financing, construction and completion in whole or in part of each of the several enterprises theretofore granted such conditional decree; and by order shall continue until the next succeeding adjudication day all conditional decrees or portions thereof not so canceled with respect to which appropriations in whole or in part reasonable diligence and progress has been shown, and shall enter final decrees for all conditional appropriations or make final any portion thereof where beneficial use of water has been made since the last hearing upon such claim, but in no event*

*to exceed the amount so applied to beneficial use nor the maximum amount fixed by the conditional decree in each instance."* (Emphasis supplied.)

Passage of time and events occurring prior to granting any final decree will produce definite answers to the questions upon which the trial judge made findings based on speculative and unsupporting evidence, and used as the basis for denying any decrees. Only time can definitely determine whether all, a part, or none of the claimed water is needed. Time and work will demonstrate whether the engineering and construction plans are feasible and can be successfully completed. Time will tell whether finances can be made available. If these prerequisites to a final decree are not brought to pass within a reasonable time, the conditional decrees must be canceled or modified as only partially established.

■ No final decree can be awarded until the water is put to beneficial use, and then only for such amount as is put to such use.

■ It is inconceivable that any development of the magnitude of that proposed by the Association involving the expenditure of more than $33,000,000.00 over a period of five or more years can be completed without the aid of the conditional decree statutes. Assurance of a decree on completion of a project is a prerequisite to complete financing, engineering and construction. The conditional decree statute is designed to meet the very problems confronting the Association, and it should be construed and applied so as to aid and encourage, rather than to block development and early use of the water resources of the state.

We find a striking similarity between the claims of the Association and the claims of the Moffat Tunnel Water and Development Company which were reviewed and sustained by this court in *Taussig v. Moffat Tunnel Co.,* 106 Colo. 384, 106 P. (2d) 363, where it was said:

"The primary objections to the decrees presented for

our consideration involve a construction of this section 195. Was there any evidence of claims and proofs of partially completed or partially perfected appropriations to satisfy the provisions of the section? The record discloses the following steps taken by the water company: Surveys by the predecessor, as applied to the entire system of the water company, were commenced July 2, 1932; the survey work for all component parts was performed by C. L. Chatfield, a licensed engineer, and other engineers working under his supervision and direction, including the preparation of maps for filing with the state engineer; the contents of these maps were set forth in numerous map exhibits; rights of way and options thereto were acquired, and after a period of two and a half years the water company obtained from the Moffat Tunnel Commission, subject to the rights of the City and County of Denver, a right of way through the Moffat tunnel for carriage of its water, the charge fixed therefor being twenty-five cents per acre-foot, with a minimum of $10,850 per year, to be paid by the water company to the Moffat Tunnel District; considerable effort was made to obtain rights of way over the public domain, which so far has not been successful. As for construction work, the record discloses that test holes were drilled at the Ranch Creek Reservoir; that work was performed in the way of clearing timber along the proposed ditch lines; that hill slopes were taken for many miles along the ditch lines; that timber along such lines was classified in respect to lands over which rights of way would have to be obtained and the survey work was completed in respect to the component parts along the entire system. Approximately $10,000 was spent on this project by the predecessor of the water company, and about the same amount by it up to the time of trial.

\* \* \*

" \* \* \* All of the facts and circumstances surrounding these claims indicate an enterprise of considerable magnitude. Only under the circumstances before us would

it be possible for private enterprise to bring water from the Western Slope to the South Platte basin on the Eastern Slope. Until there is a reasonable assurance culminating in conditional decrees, such as are before us, it would not be possible for any private enterprise to risk such a large amount of capital as is necessary to complete the same. * * *. The first step taken in the instant case toward acquiring decrees was the making of a survey of the project, which is not an unusual practice. * * *."

■ The trial court found that the Association initiated its appropriation for each of the various elements making up the Homestake Project as of September 5, 1956. We find nothing in the record to warrant such late date. The evidence is undisputed that the original surveys were begun September 22, 1952, and that work in surveying, engineering, construction, obtaining rights of way, negotiation of water-user contracts, and other activities have continued uninterrupted since that date, including the period from the initiation of these proceedings May 29, 1956, until June 6, 1957, when the taking of testimony with reference to all claims (except that of Rice) was completed and the parties had rested. Hence, under the doctrine of relation back, the date of the priorities to be awarded the Association should be September 22, 1952. *Taussig v. Moffat Tunnel Co.*, supra.

■ A minor matter concerning the Homestake Tunnel is presented by the record relating to the claim of the Association for 10 cubic feet of water per second of time which it is contemplated will seep and percolate into the Homestake Tunnel through its entire length of about five and one-half miles. The greater portion of this tunnel lies to the west of the Continental Divide in Water District No. 37; the balance being on the eastern side of the Continental Divide and in a different water district. The trial judge properly held that he could make no order concerning appropriation of waters arising in a district other than No. 37, and the decree to be

entered should be limited to not to exceed ten cubic feet of water per second of time of waters seeping and percolating into that portion of the tunnel located in Water District No. 37.

Turning now to the claim of the District — the trial judge found that it had initiated its appropriation August 10, 1956, but had failed to show due diligence thereafter.

The District commenced work on its Red Cliff Project by survey on August 10, 1956, and on October 5, 1956, filed with the state engineer its map and statement in conformity with the provisions of C.R.S. '53, 147-4-1.

Counsel for the District vigorously and persuasively argue that, having strictly complied with the Map and Statement Act, C.R.S. '53, 147-4-1, it is entitled to the benefit of the doctrine of relation of its priority date back to the date it commenced its survey. We subscribe to this contention providing there has been due diligence as required by C.R.S. '53, 147-10-6, supra.

With equal vigor, but less persuasively, counsel for the District, seeking to have the claims of the Association, Denver, and Rice denied, argue that on failure to comply strictly with the Map and Statement Act, there can be no relation back beyond the date of "Commencement of Actual Construction" of the facility. Resolution of this question is not necessary to a determination of the District's claim; however, it warrants consideration as presented in opposition to the claims of the Association and Rice, both of whom claim rights senior to those of the District.

C.R.S. '53, 147-10-6, supra, provides:

"Each claimant for appropriation of water within said water district, whether said appropriation shall have been wholly or partially completed, *and though no filing shall have been made in the office of the state engineer,* shall appear at said general adjudication proceedings and file his statement of claim and offer proof in support thereof before the district court, * * *." (Emphasis supplied.)

In *DeHaas v. Benesch,* 116 Colo. 344, 181 P. (2d) 453, this court said:

" * * * Even if plaintiff and her predecessors built no new ditch, they could make a valid appropriation by means of an existing ditch. *Nicoloff v. Bloom L. & C. Co.,* 100 Colo. 137, 66 P. (2d) 333. The evidence discloses that the waters of Green Arroyo have for many years been gathered through various channels and carried by means of the Collier Ditch to, and beneficially applied on, plaintiff's lands. This is sufficient to constitute a valid appropriation. Whether or not ditches were constructed in accordance with the filings of maps and statements in compliance with statutory provisions, or whether any map and statement was filed or any new or enlarged ditch was actually constructed are matters of evidence only, and not of the substance of the appropriation. Water rights are not based on the filings of maps or statements. Such filings do not constitute appropriations nor lack thereof invalidate them. The statute providing that appropriators shall file map and statement nowhere declares such filings are essential to a valid appropriation; it declares only that a map and statement so filed shall be prima facie evidence in any court of intent to appropriate. * * *."

Decisions of this court indicate that an appropriator is entitled to have a decree as of the date of the "first step" providing due diligence is pursued from such date, and this even though there has not been strict, or any, compliance with the Map and Statement Act. *Schluter v. Burlington Co.,* 117 Colo. 284, 188 P. (2d) 253; *Black v. Taylor,* 128 Colo. 449, 264 P. (2d) 502.

We conclude that under the foregoing statute and decisions of this court, one who has taken the necessary first step to initiate an appropriation, and subsequent thereto "has prosecuted his claims of appropriation and the financing and construction of his enterprise with reasonable diligence," is entitled to a conditional decree as of date of the first step taken.

In the findings of the trial court is the following:

"VIII. That due and reasonable diligence has not been shown by claimant."

There is no dispute in the evidence as to what the District has done which might entitle it to a conditional decree. It had done nothing prior to the commencement of this proceeding. During the pendency of the action it made its detailed survey and prepared and filed its detailed map and statement. The only other steps taken by the District which contribute to eventually applying the waters for which a conditional decree is sought is its participation in this litigation, wherein it seeks to have its own claim allowed and senior claims disallowed. Admittedly it has, except for making its survey, done nothing in the way of physical construction on the project.

It has filed its claim herein, and has vigorously prosecuted the same and opposed senior claims (also Denver's junior claim which will be considered in reviewing Denver's claim) both in the trial court and in this court.

Having been notified to appear and present its claim in this matter, proper presentation thereof was of prime importance in its program of obtaining a conditional decree. Before financing of any multi-million dollar water project can be obtained or seriously discussed, assurance of a definite maximum quantity of water to be diverted and the quality of the right as evidenced by a conditional decree, is essential. Construction of such a project without such a decree would be sheer folly. The conditional decree statute is designed to meet the obstacles confronting all who seek to complete projects of the magnitude of those contemplated by the Association, the District, and Denver and for which they seek conditional decrees looking to the eventual putting to beneficial use of unappropriated waters of the state of Colorado. Without such a decree none can proceed — with it they must proceed with due diligence.

We hold that the statutory requisite of due dili-

gence is met, during the period of the pendency of adjudication proceedings and until a conditional decree is awarded, by diligent action of the claimant in seeking to have his claim allowed and opposing in good faith the allowance of other claims which would, if allowed, be senior in point of time.

The trial court's findings that the project is speculative, the financing uncertain and that there is no need for the water to be appropriated, is contrary to the undisputed evidence. What we have said with reference to similar findings concerning the Association's claim is equally applicable here.

Similar views and fears prevailed with reference to the Big Thompson, Moffat Tunnel, Roberts Tunnel and other major projects — to many if not to most people, these projects appeared to be the dreams of visionaries; today they are beneficent realities. The trial court had no right to substitute its opinion as to the course of future events, for that of those charged with the duty of supplying adequate water for municipalities and other public bodies, who have made careful studies of the questions and problems presented and have in good faith put their vision, work, money and energies into a program by which they seek to put the public waters of the state to beneficial use. If they have miscalculated and fail, the loss is theirs — if they succeed, it will be for the eternal benefit of the peoples of the state of Colorado.

Turning now to the claim of Denver, we find a situation somewhat similar to that of the District. Denver claims to have initiated its right by survey commenced November 7, 1956, and to have followed that by the lodging of *preliminary map and statement* of the Roberts Tunnel Collection System in the office of the state engineer on December 28, 1956, and acceptance and filing thereof on January 24, 1957. The record further shows that preliminary surveys of the proposed diversions from tributaries of the Eagle River had been made in District

No. 37 in the early 1940's, through the cooperative efforts of Denver and the Bureau of Reclamation.

The surveys, which commenced on November 7, 1956, and terminated some two weeks later because of weather conditions, were all conducted in Water District No. 36, near the Dillon Dam and the intake of the Roberts Tunnel. The record does not disclose any further work (other than work on the Roberts Tunnel and the Dillon Dam) to have been done by Denver on its Roberts Tunnel Collection System. Denver has, however, prosecuted its claim with due diligence, both in the trial court and in this court. What we have said with reference to the effect thereof in establishing due diligence with reference to the claim of the District, is equally applicable to Denver's claim.

Denver claims a priority junior to the claims of all other claimants herein, and seeks only that which others do not even claim. Certainly none of the claimants can suffer any special harm by reason of Denver being permitted to take a portion or all of the unappropriated waters that no other person seeks to put to beneficial use, and yet we find the District seeking to block Denver's efforts.

In *Baca Co. v. Model Co.*, 80 Colo. 398, 252 Pac. 358, this court said:

"For our present purpose, and in view of our conclusion as to the relative rights of the Baca and Model and as between them alone, we may concede, though we do not hold, that the trial court was justified in finding as a fact that the Baca owners had appropriated, after the 1903 decree was rendered, 45.56 second cubic feet. *We may safely make this concession since the trial court here made this priority inferior to the rights of the Model, and the latter may not complain of an adjudicated priority that is later than its own.* * * *." (Emphasis supplied.)

It is quite evident that the District is opposed to any trans-mountain diversion, as evidenced by its brief op-

posing the claim of Denver wherein it is urged that the future welfare of certain sections of the state depends upon full development of water resources within the natural basins of certain named rivers.

We find nothing in the Constitution which even intimates that waters should be retained for use in the watershed where originating.

The waters here involved are the property of the public, not any segment thereof, nor are they dedicated to any geographical portion of the state.

The right to appropriate water and put the same to beneficial use at any place in the state is no longer open to question.

From the record before us it is clear that the Dillon Dam, Roberts Tunnel, and facilities of Denver between the outlet of the tunnel and the ultimate consumer of the waters stored and transported thereby, can be and will be used for the application and beneficial use of the waters to be diverted and for which claim is made in Water District No. 37.

Presented here is a very different situation from that found in *Denver v. Northern Colo. Water Dist.*, 130 Colo. 375, 276 P. (2d) 992 (Blue River case), wherein Denver sought to have the court consider work done on the Frazer River and Williams Fork projects as evidence of due diligence on its Blue River project. In the Blue River case the court pointed out that the Frazer River water was to be carried through the Moffat Tunnel, the Williams Fork water was to be carried through the Jones Pass Tunnel, whereas the Blue River water, for which a conditional decree was sought, was to be carried through the Montezuma (Roberts) Tunnel. Work done on the Williams Fork and Frazer River projects could in no manner serve to bring water from the Blue River at the intake of the Montezuma (Roberts Tunnel) to Denver.

Here the Eagle River water is to be carried through the Dillon Reservoir and the Roberts Tunnel — without those facilities Eagle River water could not reach Den-

ver; they are just as necessary to the ultimate goal of putting the water to beneficial use in Denver as is a diversion dam on the streams from which water is to be diverted.

The court recognized this in the Blue River case in the following language:

" * * * However, the fact that the City of Denver was engaged in the construction of these or other enterprises may properly be considered together with all other evidence as to existing facilities and ability of the city in determination of the issue of reasonable diligence."

In fact, in order to make an appropriation, no new facilities need be contracted. *DeHaas v. Benesch,* supra.

What Denver is seeking to do is to bring water from the Eagle River to the ultimate consumer in Denver. Whether one starts work on the dam and headgate at the point of diversion, at the point where the water is put to beneficial use, or at some intermediate point or points, is immaterial. Actual good faith work on the over-all facilities necessary to consummate the ultimate goal is a part of the diligence required to continue a conditional decree and to have it ripen into an absolute decree. Whether future work will satisfy future diligence, is a matter to be determined in the future at hearings provided for in C.R.S. '53, 147-10-8, supra.

The trial court also made findings to the effect that there was no proof of need for the water sought, that the project is entirely speculative and the financing uncertain. These are all matters of opinion and concerning which there must be definite proof in the future. What we have said with reference to these findings on the claim of the Association is equally applicable to Denver's claim. Courts should not intrude their own opinions to override the studied good-faith opinions of governmental agencies as to future needs of the public for facilities or commodities. *Denver v. Commissioners,* 113 Colo. 150, 156 P. (2d) 101.

Turning now to the claim of Rice, the record fails to

show that any survey has been made, no map or statement was filed, no construction of any kind has been undertaken. The most that can be said of his claim is that he owns some land and some day might build some cabins thereon; that some day he might need water for placer operations if he were to find some minerals on his lands. He has taken no steps to initiate an appropriation and therefore the judgment denying his claim is affirmed.

The judgment denying the claims of the Association, the District, and Denver is reversed and the cause remanded with directions to the trial court to enter its decree granting to each claimant respectively a conditional priority for the diversion and storage rights in the amounts claimed insofar as the facilities for their diversion are located in Water District No. 37, said priorities to be of dates as requested and each to be upon the express condition that the claimants proceed with due diligence, from the date of the decree, to apply the waters so decreed to beneficial use.

MR. JUSTICE SUTTON not participating.