In the Matter of the Adjudication of Priorities to the Right to the Use of Water For All Beneficial Purposes in Water District No. 36, Irrigation Division No. 5, State of Colorado.

In the Matter of the Adjudication of Priorities to the Right to the Use of Water For All Beneficial Purposes in Water District No. 37, Irrigation Division No. 5, State of Colorado.

In the Matter of the Adjudication of Priorities to the Right to the Use of Water For All Beneficial Purposes In Water District No. 52, Irrigation Division No. 5, State of Colorado.

CITY AND COUNTY OF DENVER, acting By and Through its BOARD OF WATER COMMISSIONERS, Appellant,

v.

COLORADO RIVER WATER CONSERVATION DISTRICT, United States of America, Northern Colorado Water Conservancy District, Municipal Subdistrict Northern Colorado Water Conservancy District, City of Colorado Springs, City of Aurora, and Central Colorado Water Conservancy District, Appellees.

No. 82SA259.

Supreme Court of Colorado, En Banc.

Jan. 21, 1985.

As Modified on Denial of Rehearing March 11, 1985.

Wayne D. Williams, Michael L. Walker, Henry C. Teigen, Anne R. McGee, Casey S. Funk, Saunders, Snyder, Ross & Dickson, P.C., Glenn G. Saunders, Jack F. Ross, Denver, for appellant.

Donald H. Hamburg, Leavenworth, Patrick & Lochhead, P.C., Loyal E. Leavenworth, Kevin L. Patrick, James L. Lochhead, Peter A. Milwid, Glenwood Springs, for appellee Colorado River Water Conservation Dist.

Davis, Graham & Stubbs, John M. Sayre, Robert V. Trout, Denver, for appellees Northern Colorado Water Conservancy Dist. and Municipal Subdistrict Northern Colorado Water Conservancy Dist.

Broadhurst & Petrock, Kenneth L. Broadhurst, J.J. Petrock, Frederick A. Fen-

del, III, Denver, for appellee City of Aurora and for amici curiae Bear Creek Water and Sanitation Dist., Bennett Bear Creek Farm Water & Sanitation Dist., Board of County Commissioners of Adams County, Castlewood Water Dist., Cherryridge Water & Sanitation Dist., City of Lafayette, City of Littleton, City of Thornton, Consolidated Mutual Water Co., Dolly-O-Denver Water & Sanitation Dist., East Cherry Creek Valley Water & Sanitation Dist., Grant Water & Sanitation Dist., Green Mountain Park Water & Sanitation Dist., Greenwood Plaza Water Dist., Havana Water & Sanitation Dist., Inverness Water & Sanitation Dist., Lakehurst Water & Sanitation Dist., Meadowbrook Water Dist., North Side Water & Sanitation Dist., North Washington Street Water & Sanitation Dist., Platte Canyon Water & Sanitation Dist., Pleasant View Water & Sanitation Dist., Southwest Metropolitan Water & Sanitation Dist., Southwest Water & Sanitation Dist., Willowbrook Water & Sanitation Dist., and Willows Water Dist.

Baker & Cazier, Stanley W. Cazier, Granby, for amicus curiae Middle Park Water Conservancy Dist.

Gerald E. Dahl, Frisco, for amicus curiae Northwest Colorado Council of Governments.

Calkins, Kramer, Grimshaw & Harring, James S. Bailey, Jr., Wayne B. Schroeder, David C. Hallford, Betty J. Bona, Denver, for amicus curiae Vail Valley Consolidated Water Dist.

No appearance for appellee United States of America.

LOHR, Justice.

The City and County of Denver, acting by and through its Board of Water Commissioners (Denver), appeals from a judgment of the water judge for Water Division 5 denying Denver's claims for certain conditional water rights. In resolving this appeal, we: (1) reverse the trial court's ruling that Denver lacked authority to make the claimed appropriations of water for use outside its boundaries, (2) reverse in part that court's determination that Denver did not form the requisite intent to effect any of the claimed appropriations, (3) determine that Denver performed the necessary overt acts to initiate some but not all of its claims, and (4) conclude that the trial court must conduct further proceedings to resolve whether Denver had the necessary firm contractual commitments or agency agreements to supply water to users outside its boundaries in order to satisfy the requirements of *Colorado River Water Conservation District v. Vidler Tunnel Water Co.*, 197 Colo. 413, 594 P.2d 566 (1979). Therefore, we affirm in part, reverse in part, and remand for further proceedings.

I.

We begin with a review of the claims asserted by Denver, and of the procedural history of this litigation.

Judicial proceedings in this matter were commenced in the summer of 1968 when Denver filed statements of claim for those portions of its Roberts Tunnel Collection System water rights that had not yet been adjudicated. These claims for conditional water right decrees were filed in two supplemental water right adjudication suits pursuant to section 7 of what was commonly known as the Adjudication Act of 1943 (1943 Act), then codified as section 148-9-7, 7 C.R.S. (1963).[1] Thereafter, Denver filed an additional statement of claim in one of those suits, and yet another such statement in a third supplemental water adjudication suit, seeking conditional water right decrees for its proposed Eagle-Colorado Collection System. Separate descriptions of these two groups of claims and a summary of the progress of the resulting litigation

---

1. *See* ch. 190, sec. 7, 1943 Colo.Sess.Laws, 613, 618. The 1943 Act was codified at the time as article 9 of chapter 148, 7 C.R.S. (1963). The 1943 Act was repealed in its entirety upon the adoption of the Water Right Determination and Administration Act of 1969, ch. 373, sec. 20(1), 1969 Colo.Sess.Laws 1200, 1223. The 1969 Act is codified as article 92 of title 37, 15 C.R.S. (1973 and 1984 Supp.).

will facilitate an understanding of the issues to be resolved by this court.

### A. *Roberts Tunnel Collection System Claims.*

Denver proposes to use the Roberts Tunnel Collection System to divert water from tributaries of the Blue, Eagle and Piney Rivers and from the Piney River itself, all of which are tributaries of the Colorado River. The water from the drainages of the Eagle and Piney Rivers will be carried through a series of tunnels, conduits and canals across Vail Pass to Ten Mile Creek and thence to Dillon Reservoir. The water from the Blue River drainage will flow through conduits and canals to that reservoir. From Dillon Reservoir, the water will be transported through the Harold D. Roberts Tunnel under the Continental Divide and deposited in the North Fork of the South Platte River near Grant. From there, the water will travel down the South Platte to Denver's intake structures. Denver also plans to store water in the proposed Piney Reservoir on the Piney River and in the proposed Two Forks Reservoir near the confluence of the North Fork and the South Fork of the South Platte River, and in Marston Reservoir, farther down the South Platte River. In addition, Denver proposes to store water, by exchange, in three existing reservoirs on the South Fork of the South Platte River—Cheesman, Eleven Mile Canon and Antero Reservoirs. Denver has sought decrees for both storage and direct flow water rights for the Roberts Tunnel Collection System. Denver proposes to use the water from the Roberts Tunnel Collection System for "all municipal uses," including a number of specifically designated uses.

Denver has already received either conditional or absolute decrees for the Roberts Tunnel and Dillon Reservoir and, in a subsequent and separate proceeding, for the Eagle River Unit of the Roberts Tunnel Collection System. *See Metropolitan Suburban Water Users Association v. Colorado River Water Conservation District,* 148 Colo. 173, 365 P.2d 273 (1961) (*Metropolitan Suburban*). *See also People ex rel. City & County of Denver v. District Court,* 154 Colo. 84, 388 P.2d 403 (1964) (directing the district court to enter a decree in accordance with the order of the court in *Metropolitan Suburban*). In the statements of claim here, Denver seeks conditional decrees for the rest of the Roberts Tunnel Collection System, as follows:

1. *Straight Creek Conduit.* The Straight Creek Conduit is to be a series of canals and conduits, a diversion dam, and other water carrying and control devices that will divert water at the rate of 115 cubic feet per second (cfs) from Straight Creek and its tributary drainage and transport it approximately 2½ miles to Dillon Reservoir. Straight Creek is a tributary of the Blue River.

2. *East Gore Range Canal.* The East Gore Range Canal is to consist of a series of conduits, canals, diversion dams and other water carrying and control devices that will extend along the west side of the Blue River for approximately 40 miles at or above an elevation of 9017 feet and will terminate in Dillon Reservoir. Denver intends that this canal will intercept various tributaries of the Blue River lying west of that river and north of Dillon Dam up to and including Cataract Creek. The streams and the claimed amounts to be diverted are the following: Saltlick Gulch (30 cfs), Willow Creek (100 cfs), Maryland Creek (25 cfs), South Rock Creek (65 cfs), North Rock Creek (95 cfs), Pebble Creek (15 cfs), Boulder Creek and tributary drainage (90 cfs), Harrigan Creek (two branches) (10 cfs), Slate Creek (100 cfs), Hay Camp Creek, Squaw Creek, South Brush Creek and Brush Creek (35 cfs total), Black Creek (two branches) (205 cfs), Otter Creek (three branches) (35 cfs), and Cataract Creek (100 cfs), for a total diversion of 905 cfs.

3. *Storage Rights Incident to Straight Creek Conduit and East Gore Range Canal Claims.* Storage rights claimed by Denver for the water from the Straight Creek Conduit and the East Gore Range Canal consist of Dillon Reservoir (254,036 acre feet), Two Forks Reservoir (600,000 acre feet), Marston Reservoir (19,800 acre

feet), and, by exchange, Antero Reservoir (85,564 acre feet), Eleven Mile Canon Reservoir (97,779 acre feet) and Cheesman Reservoir (79,064 acre feet).

4. *Piney River Unit.* The Piney River Unit is described by Denver as a series of conduits and tunnels that will collect water from various tributaries of the Piney River and will transport the water to the proposed Piney Reservoir, which will be constructed on the Piney River. From that point, a tunnel will carry the water from the Piney River drainage southerly into the Eagle River drainage and into the tunnels, canals and conduits of the Eagle River Unit of the Roberts Tunnel Collection System. Water from the Eagle River and Piney River Units will then be taken by the Vail Pass Tunnel eastward into the Blue River drainage basin and, eventually, into Dillon Reservoir and through the Roberts Tunnel. Denver proposes to divert the following amounts from the following streams for the Piney River Unit: Piney River and tributary drainage (170 cfs), East Meadow Creek and tributary drainage (35 cfs), Meadow Creek and tributary drainage (30 cfs), Freeman Creek and tributary drainage (15 cfs), Dickson Creek and its branches and tributary drainage (25 cfs), and Moniger Creek and tributary drainage (15 cfs), for a total of 290 cfs.

5. *Storage Rights Incident to Piney River Unit.* Storage rights are claimed by Denver in the proposed Piney Reservoir for 40,000 acre feet. Storage rights claimed by Denver in other reservoirs are identical to those claimed for the Straight Creek Conduit and the East Gore Range Canal.

Denver claims that the date of initiation of the appropriation for the Roberts Tunnel Collection System, including the portions involved in this adjudication, is November 7, 1956. This date was recognized in *Metropolitan Suburban* as the date of initiation of the appropriation for the Eagle River Unit of that system. 148 Colo. at 181, 200–03, 365 P.2d at 277, 288–89. The survey upon which this appropriation date is based is not described in detail in *Metropolitan Suburban.* The record in the present case, however, shows that on that date Denver initiated a survey of the proposed Straight Creek Conduit. A preliminary map and statement describing the Roberts Tunnel Collection System was executed by Denver in late December of 1956 and was accepted for filing in the office of the state engineer on January 21, 1957.

Denver's proposed Straight Creek Conduit and East Gore Range Canal lie in former Water District No. 36.[2] Therefore, Denver filed its 1968 statement of claim detailing these projects in a supplemental adjudication suit then pending for Water District No. 36 in the Summit County District Court, civil action no. 2371.[3] The Piney River Unit, as proposed, lies in former Water District No. 52;[4] therefore, Denver filed its 1968 statement of claim for this project in a supplemental adjudication then pending for that former water district in the Eagle County District Court, civil action no. 1548. Initial hearings concerning the claims by Denver and others in Water

**2.** Until the adoption of the 1969 Act replaced them with larger "water divisions," Colorado was divided into seventy "water districts." *See* article 13 of chapter 148, 7 C.R.S. (1963) (repealed 1969). Water District No. 36 consisted of "all the lands irrigated from water taken from the Blue river and its tributaries." § 148–13–37, 7 C.R.S. (1963) (repealed 1969). By the 1943 Act, district courts had jurisdiction to hear adjudication suits concerning claims to water from the same source of water within a water district. § 148–9–2, 7 C.R.S. (1963) (repealed 1969). Article 13 of chapter 148 of the 1963 codification of the statutes was repealed by chapter 373, section 20(1), 1969 Colo.Sess.Laws 1200, 1223.

**3.** Supplemental adjudication suits were provided for by section 7 of the 1943 Act, last codified as section 148–9–7, 7 C.R.S. (1963) (repealed 1969).

**4.** Water District No. 52 consisted of "all lands on the south side of the Grand [Colorado] river irrigated by water taken from the Grand river below the mouth of Blue river and above the mouth of Roaring Fork river, and from the streams draining into the said portion of the Grand river, except Eagle river and its tributaries." § 148–13–52, 7 C.R.S. (1963) (repealed 1969).

District No. 52 were held on November 10–12, 1971, before former District Court Judge Charles F. Stewart.

B. *Eagle-Colorado Collection System.*

Denver proposes to use the Eagle-Colorado Collection System to divert water from the Colorado and Eagle Rivers and from Alkali Creek, a tributary of the Eagle River, into the proposed Eagle-Colorado Reservoir to be constructed on Alkali Creek near Wolcott. From the Eagle-Colorado Reservoir, the water will be transported by tunnel eastward to the Eagle River portion of the Roberts Tunnel Collection System and, then, across Vail Pass, down Ten Mile Creek, into Dillon Reservoir and across the Continental Divide to Denver, by the same delivery system described earlier. Denver sought a conditional decree of direct flow and storage rights, the water to be used for "all beneficial uses" including municipal and other described uses. The claims comprising the Eagle-Colorado Collection System are as follows:

1. *Colorado River Unit.* Denver proposes to divert 3000 cfs from the Colorado River near State Bridge by pump, then carry the water into the Eagle River drainage by tunnel and deposit it into the proposed Eagle-Colorado Reservoir.

2. *Eagle River Unit.* Denver proposes to divert 2500 cfs from the Eagle River either at a pump diversion point near Wolcott or at a gravity diversion point near Avon, and to transport the water by conduit to the proposed Eagle-Colorado Reservoir.

3. *Eagle-Colorado Reservoir, and Alkali Creek.* The Eagle-Colorado Reservoir will be formed by constructing a dam across the lower portion of Alkali Creek, a tributary which flows into the Eagle River from the north near Wolcott. Denver also proposes to divert 40 cfs from Alkali Creek itself. For the Eagle-Colorado Reservoir, Denver claims a right to store 350,000 acre feet of water.

4. *Other Storage Rights Incident to Eagle-Colorado Collection System Claims.* As part of its Eagle-Colorado Collection System, Denver also claims the following rights to store water either directly or by exchange: Piney Reservoir (40,000 acre feet), Dillon Reservoir (254,036 acre feet), Two Forks Reservoir (600,000 acre feet), Marston Reservoir (19,800 acre feet), Antero Reservoir (85,564 acre feet), Eleven Mile Canon Reservoir (97,779 acre feet), and Cheesman Reservoir (79,064 acre feet).

The date of initiation of the appropriation for the Eagle-Colorado Collection System, as claimed by Denver, is November 23, 1971. Denver bases that date on an alleged concurrence of the adoption of a resolution of intent to appropriate by Denver's Board of Water Commissioners (Board) and the posting of signs at relevant points along the Colorado and Eagle Rivers by personnel of the Denver Water Department. (Testimony at the hearings on the claims established that the signs were posted on the next day, November 24.)

On November 26, 1971, Denver filed claims for the Eagle River Unit of the proposed Eagle-Colorado Collection System in a supplemental adjudication proceeding pending for Water District No. 37 [5] in the District Court for Eagle County, civil action no. 1529. Then, on November 30, 1971, Denver filed claims for the Colorado River Unit of its proposed Eagle-Colorado Collection System in the supplemental adjudication suit pending for Water District No. 52 in Eagle County District Court, civil action no. 1548.

C. *Further Procedural History.*

Early in 1972, then Chief Justice Edward E. Pringle assigned District Court Judge Charles F. Stewart to hear and determine all matters arising in the supplemental adjudications in the three water districts. The assignment was pursuant to a portion of the Water Right Determination and Administration Act of 1969 (1969 Act) that provided for the continuation of proceed-

---

**5.** Water District No. 37 consisted of "all lands lying in the state of Colorado irrigated by waters taken from the Eagle river and its tributar-

ies." § 148–13–38, 7 C.R.S. (1963) (repealed 1969).

ings pending under the 1943 Act at the time the 1969 Act, which replaced the 1943 Act, came into effect. In particular, a 1970 amendment to the 1969 Act authorized the chief justice to designate a particular judge to complete proceedings in adjudications then pending under the 1943 Act. 1969 Act, ch. 373, sec. 1, 1969 Colo.Sess.Laws 1200, 1218–19, as amended by ch. 103, sec. 5, 1970 Colo.Sess.Laws 430, 433–34. This section, as amended, was originally codified at section 148–21–44 of the 1969 supplement to the 1963 codification of the Colorado Revised Statutes and is now codified at section 37–92–601, 15 C.R.S. (1973).

In turn, Judge Stewart appointed one referee, Michael D. White, to act in each of the three supplemental adjudications involved in the instant appeal, pursuant to the authority and procedures outlined in section 4 of the 1943 Act,[6] ch. 190, sec. 4, 1943 Colo.Sess.Laws 613, 615–16, last codified at § 148–9–4, 7 C.R.S. (1963), repealed, ch. 373, sec. 20(1), 1969 Colo.Sess.Laws 1200, 1223.

Hearings concerning Denver's claims were held before the referee on April 24–25, 1972, May 11, 1972, August 11–15, 1975, and August 28—September 5, 1975. No evidence has been taken concerning Denver's claims relating to any activities that may have occurred after completion of the hearings before the referee in 1975. Actively participating in opposition to Denver's claims were the Colorado River Water Conservation District (District) and the United States of America. Also entering appearances, but not actively participating, were the Central Colorado Water Conservancy District, the City of Colorado Springs, the City of Aurora, and the Northern Colo-

rado Water Conservancy District and its Municipal Subdistrict.

On April 3, 1978, the referee filed a partial report and proposed decree with the water court[7] denying each of Denver's claims. The partial report included a review of the evidence, several memoranda of law, findings of fact and conclusions of law. In particular, the referee concluded that the Board never formed a specific and definite intent "as of the dates claimed or at any time thereafter" to proceed with those projects described in the statements of claim. In addition, the referee found that the water claimed by Denver would not be used within the boundaries of Denver or needed for Denver's future development, but rather would be sold or leased to water users outside Denver. Based upon his review of the Colorado Constitution, statutes, case law and Charter of the City and County of Denver, the referee concluded that Denver was without authority or capacity to appropriate water solely for use outside its municipal boundaries. Therefore, according to the referee, Denver could not legally form the intent to appropriate water for such use.

In June of 1978, Denver filed a protest and objection to the referee's partial report with the water court. Oral argument on Denver's protest was heard on December 9, 1981, by Judge Gavin D. Litwiller, who was both the water judge for Water Division 5 and the successor to Judge Stewart as the judge designated to preside over the supplemental adjudication proceedings. On March 3, 1982, Judge Litwiller issued an interlocutory decree which adopted the partial report of the referee, approved the

---

**6.** The referee, and the parties, style the referee a "Master-Referee" and state that he was appointed as a master under C.R.C.P. 53 as well as a referee under the 1943 Act. In the interlocutory decree, Judge Litwiller also refers to the referee as a "Master-Referee." However, the record discloses no appointment other than as a referee under section 4 of the 1943 Act, then codified at section 148–9–4, 7 C.R.S. (1963) (repealed 1969). In this opinion, we will refer to him simply as the "referee."

**7.** Any adjudication proceedings commenced under the 1943 Act and not concluded by June 1, 1972, "shall be heard from that time on to completion by the water judge for the division in which the proceedings are pending...." § 37–92–601, 15 C.R.S. (1973). Thus, the water judge of the district courts of all counties situated entirely or partly within water division 5 (water court) had jurisdiction over the proceedings from June 1, 1972, forward. §§ 37–92–201(1)(e) and –203(1), 15 C.R.S. (1973 and 1984 Supp.).

proposed decree, and denied all of Denver's claims. Denver then brought this appeal.

In its answer brief before this court, the District argues that the trial court lacked subject matter jurisdiction to consider Denver's claims for the Eagle-Colorado Collection System, which were filed in November of 1971. Before discussing the merits of Denver's appeal, we must review this jurisdictional question.

## II.

■ Twelve years after Denver filed its claims to the Eagle-Colorado Collection System in the supplemental adjudications then pending in Water Districts Nos. 37 and 52, the District first raised the contention, in this appeal, that the trial court lacked subject matter jurisdiction to hear those claims under the 1943 Act. We conclude that the trial court had jurisdiction.

As previously noted, the Adjudication Act of 1943 was repealed and replaced in 1969 by the Water Right Determination and Administration Act. Ch. 373, sec. 20(1), 1969 Colo.Sess.Laws 1200, 1223. The 1969 Act, as amended in 1970 and 1971, provides in part:

> All proceedings pending on June 7, 1969, for the adjudication of water rights ... shall be concluded by June 1, 1972, in accordance with the provisions of the statute under which they are instituted, and priorities and changes of water rights which are determined in such pending proceedings shall be integrated by the various division engineers in their current records and shall be included in tabulations prepared by the division engineers pursuant to the provisions of this article. Any such proceedings which are not concluded by June 1, 1972, shall be heard from that time on to completion by the water judge for the division in which the proceedings are pending, under procedures provided for in this article; except that the chief justice of the supreme court may provide that a judge, other than the water judge, shall complete proceedings in specific cases. Persons who have filed statements of claim in such pending proceedings may withdraw therefrom at any time and file applications or otherwise proceed in accordance with this article....

Section 37–92–601, 15 C.R.S. (1973). *See* ch. 373, sec. 1, 1969 Colo.Sess.Laws 1200, 1218–19, as amended by ch. 103, sec. 5, 1970 Colo.Sess.Laws 430, 433–34, and by ch. 377, sec. 1, 1971 Colo.Sess.Laws 1339, 1339–40.

The relevant supplemental adjudication suits in former Water Districts Nos. 37 and 52 were "proceedings pending on June 7, 1969, for the adjudication of water rights." The issue is whether Denver could file claims in these proceedings in 1971, two years after the 1943 Act procedures for adjudicating water rights were replaced by the procedures of the 1969 Act. In other words, did the allowance in the 1969 Act for the continuation of pending proceedings under the 1943 Act contemplate the filing of new claims in these proceedings after the effective date of the 1969 Act? The answer to this question is grounded in the procedures authorized by the 1943 Act.

Under the 1943 Act, the district court was given jurisdiction

> [f]or the purpose of hearing, adjudicating and settling all questions concerning the priority of appropriation of water between owners and claimants of water rights drawing water from the same source within the same water district, and all other questions of law and questions of right growing out of, or in any way involved or connected therewith....

§ 148–9–2, 7 C.R.S. (1963) (repealed 1969). An adjudication suit or a supplemental adjudication suit concerning claims to water rights was initiated by the filing of a petition setting forth the water rights owned or claimed by the petitioner. §§ 148–9–3 and –7, 7 C.R.S. (1963) (repealed 1969). Notice of the initiation of such a suit was required to be published and mailed to other claimants of water rights and water users within the water district. §§ 148–9–5 and –7, 7 C.R.S. (1963) (repealed 1969). The purpose of the notice was to afford

those who had not yet filed claims an opportunity to file their own claims in the adjudication suit and to resist claims of others. *See id.*

Only those persons who were not notified of a pending adjudication suit were allowed to file a petition to reopen a decree obtained in such an action. The time for filing was limited to two years. Such a petition could be granted by the court for good cause. § 148–9–16(1) and (2), 7 C.R.S. (1963) (repealed 1969). Two years after the date of rendition of any decree, the decree became final and binding "as to all water rights in the water district existing at the date of the rendition of the decree and for which no statements of claim were filed in ⸱said general adjudication proceeding...." § 148–9–16(3), 7 C.R.S. (1963) (repealed 1969). After that, a person could not file a claim in the original adjudication but could only institute a supplemental adjudication suit. *See* § 148–9–7, 7 C.R.S. (1963) (repealed 1969).

Under the 1943 Act, each priority adjudicated in a supplemental adjudication is junior to those adjudicated in a prior adjudication suit. § 148–9–13(3), 7 C.R.S. (1963) (repealed 1969).[8]

Thus, it was crucial to the operation of the 1943 Act that possible claimants receive notice and be afforded sufficient time to file their claims in an adjudication suit in order to protect their rights. The 1943 Act did not require that any particular amount of time pass from the initiation of an adjudication suit until the trial or until the

entry of the decree. However, the 1943 Act did provide:

> The court shall have power to make all orders and rules consistent with this article which may be found necessary and expedient from time to time during the progress of the case for carrying out the intent of this article.... This article shall be construed liberally in all courts in favor of securing to all persons interested the just determination and protection of their rights.

§ 148–9–18, 7 C.R.S. (1963) (repealed 1969).

In exercising their powers under the 1943 Act, district courts routinely set a final date by which all claims in a 1943 Act adjudication suit were required to be filed. Such orders were consistent with the letter and spirit of the Act and were within the scope of the discretionary authority given to the courts by section 148–9–18. We perceive nothing in section 37–92–601 to suggest that the legislature intended to limit the discretion of the district courts to establish final dates for filing claims in 1943 Act adjudication suits being completed under the authority of that section.

The District does not dispute Denver's assertion that the final date for the filing of claims in the relevant adjudication pending in Water District No. 37 was set by a district court judge for December 1, 1971, and that the final date for the filing of claims in the relevant adjudication pending in Water District No. 52 was set by a district court judge for December 31, 1971, although the record is incomplete on these matters.[9] Denver's claims for the Eagle-

---

8. In general, this same principle applied in adjudications based on the laws existing prior to the 1943 Act. *Hardesty Reservoir, Canal & Land Co. v. Arkansas Valley Sugar Beet & Irrigated Land Co.,* 85 Colo. 555, 559, 277 P. 763, 765 (1929). *See also Huerfano Valley Ditch & Reservoir Co. v. Hinderlider,* 81 Colo. 468, 474, 479–80, 256 P. 305, 307, 309 (1927). An analogous principle applies in 1969 Act adjudications. §§ 37–92–306 and –306.1, 15 C.R.S. (1973 and 1984 Supp.). *See generally* § 37–92–401, 15 C.R.S. (1973 and 1984 Supp.), establishing the rules that the state engineer is to employ in compiling tabulations of decreed water rights and conditional water rights in order of seniority.

9. The parties did not designate as a part of the record any orders of the district courts establishing the final dates for the filing of claims in the relevant adjudication suits, perhaps because this jurisdictional issue had not yet been raised at the time the record was designated. Denver attached to its reply brief a page from an order signed by Judge Stewart establishing December 31, 1971, as the "final date for the filing of claims." The incomplete attachment does not state whether it refers to any adjudication suit involved here.

Colorado Collection System were filed on November 26 and 30, 1971, in the adjudication suits pending in Water Districts Nos. 37 and 52, respectively. These filings were well within the time limits set by the district courts, and there is nothing in the record to indicate that selection of these particular limits was not a proper exercise of judicial discretion. Thus, the 1971 filings must be deemed a part of the proceedings that were pending on June 7, 1969. Pursuant to the 1943 Act and the savings clause in the 1969 Act, the district court had subject matter jurisdiction over Denver's 1971 claims as part of the 1943 Act proceedings.[10]  § 37–92–601, 15 C.R.S. (1973).

We next turn to the merits of Denver's claims, beginning with the referee's conclusion that Denver does not have the authority to appropriate water solely for use outside its boundaries.

### III.

The water court adopted the following conclusion of law when it adopted the referee's report: .

> Based on the Colorado Constitution, statutes, and case law, and the charter of the City and County of Denver, it is the conclusion of the Master-Referee that the City and County of Denver is without authority or capacity to appropriate water solely for use outside its municipal boundaries. Therefore, the City and County could not have formed the required intent for a valid appropriation of any of the waters which it claims, since the evidence has shown the water claimed would not be used within the City and County and is not needed for future development of the City and County. Rather, the water claimed would be used for sale or lease purposes, on an indefinite basis, to water users outside the City and County.

Denver argues that it has the authority and capacity to appropriate water and deliver it to customers outside the boundaries of Denver and notes that it has been operating in such a manner since the early years of this century. Our review of the evidence and the law pertinent to this case leads us to the conclusion that Denver possesses the requisite authority and capacity.

■ The City and County of Denver is a constitutionally created home rule city. As such, Denver may exercise only those powers granted by the state constitution—including plenary legislative power over local and municipal matters—and not restricted by its charter, Colo. Const. art. XX, §§ 1 and 6; *Service Oil Co. v. Rhodus*, 179 Colo. 335, 344, 500 P.2d 807, 811 (1972), and those powers granted by the General Assembly in areas where the city derives no authority from the constitution. *Davis v. City & County of Denver*, 140 Colo. 30, 35–37, 342 P.2d 674, 676–77 (1959); *People ex rel. Rogers v. Letford*, 102 Colo. 284, 299–300, 79 P.2d 274, 282 (1938).

■ In purely local and municipal matters, as contrasted with matters of statewide concern, the charter provisions and legislation of a home rule city such as Denver supersede conflicting state statutes. Colo. Const. art. XX, § 6; *Denver & Rio Grande Western Railroad Co. v. City & County of Denver*, 673 P.2d 354, 357–58 (Colo.1983); *DeLong v. City & County of Denver*, 195 Colo. 27, 31, 576 P.2d 537, 539 (1978). In matters of purely statewide concern, and in absence of a grant to the city of specific power by the constitution or by state statutes, the General Assembly is free to adopt legislation, and the city is without power to act at all. *Davis v. Denver*, 140 Colo. at 35, 342 P.2d at 676. *See also DeLong v. Denver*, 195 Colo. at 31, 576 P.2d at 539–40; *Woolverton v. City & County of Denver*, 146 Colo. 247, 252, 361 P.2d 982, 984 (1961).

---

**10.** The 1969 Act allows claimants in pending 1943 Act proceedings to withdraw their claims and file new claims under the 1969 Act. § 37–92–601, 15 C.R.S. (1973). Contrary to the District's argument, this does not have any relevance to the question of whether a claim could be filed in a pending 1943 Act proceeding after the June 7, 1969, effective date of the 1969 Act.

■ We have long recognized, however, that matters often are not exclusively of local or statewide concern but are properly of concern to both levels of government. When this is true, the state, the municipality, or both, may enact legislation concerning the matter. The enactments of both may coexist; only if the state and local enactments conflict will the state legislation supersede the legislation of the municipality. *Denver & Rio Grande Western Railroad Co. v. Denver*, 673 P.2d at 358; *DeLong v. Denver*, 195 Colo. at 31–32, 576 P.2d at 539–40; *Woolverton v. Denver*, 146 Colo. at 251–59, 361 P.2d at 983–88.

■ We have not attempted to devise a legal standard that can be applied with litmus test certainty to determine whether any particular issue is a matter of local, statewide or mixed concern. Instead, we have made such determinations on an ad hoc basis, taking into account the facts of each case. *Denver & Rio Grande Western Railroad Co. v. Denver*, 673 P.2d at 358. The respective legislative bodies of a municipality and the state are the judges in the first instance of whether a matter is of local or statewide concern. *Century Electric Service & Repair, Inc. v. Stone*, 193 Colo. 181, 183, 564 P.2d 953, 954 (1977); *McNichols v. City & County of Denver*, 101 Colo. 316, 324, 74 P.2d 99, 103 (1937).

■ Turning to the instant case, the people of Denver have delegated complete authority over their water supply to the Board of Water Commissioners of the City and County of Denver. Charter of the City and County of Denver (Denver Charter), secs. C4.14, C4.18.[11] The people have specifically authorized the Board to lease water and water rights for use outside the boundaries of Denver, with certain restrictions. Denver Charter, sec. C4.26.[12] The record shows that over the course of decades the Board has continually exercised that authority by providing water to users throughout the Denver metropolitan area by lease contracts. Furthermore, the referee made a finding, supported by evidence in the record and not disputed by the District, that "the use of water outside the municipal boundaries is of some benefit to the residents of the City and County of Denver." When adopting the referee's report, the district judge adopted that finding.

We see no reason to disturb that finding. Nor do we see any reason to disturb the implicit conclusion of the people of Denver and of their Board of Water Commissioners that providing water to users within the Denver metropolitan area but outside the boundaries of Denver is a matter of local concern to Denver, even if an appropriation

---

11. Section C4.14 of the Charter of the City and County of Denver reads as follows:

There shall be and hereby is continued and created a non-political Board of Water Commissioners of five members, to have complete charge and control of a water works system and plant for supplying the City and County of Denver and its inhabitants with water for all uses and purposes.

Section C4.18 of Denver's Charter goes on to provide, in part:

The Board shall have and exercise all the powers of the City and County of Denver including those granted by the Constitution and by the law of the State of Colorado and by the Charter in regard to purchasing, condemning and purchasing, acquiring, constructing, leasing, extending and adding to, maintaining, conducting and operating a water works system and plant for all uses and purposes, and everything necessary, pertaining or incidental thereto....

12. Section C4.26 of the Charter of the City and County of Denver reads as follows:

The Board shall have power to lease water and water rights for use outside the territorial limits of the City and County of Denver, but such leases shall provide for limitations of delivery of water to whatever extent may be necessary to enable the Board to provide an adequate supply of water to the people of Denver and provided, further, that every such lease shall contain terms to secure the payment into the Water Works Fund of sufficient money to fully reimburse the people of Denver for the cost of furnishing the water or water right which is the subject of such lease together with an additional amount to be determined by the Board. Sales at amounts less than the above minimum may be made if warranted by economic conditions, but a contract providing for such lesser charge shall not extend for more than one year.

by Denver is intended solely for that purpose. We have recognized before that cities may have a demonstrable interest in providing services, including a supply of water, to users outside their boundaries in certain circumstances. *See, e.g., Cottrell v. City & County of Denver,* 636 P.2d 703 (Colo.1981); *City of Northglenn v. City of Thornton,* 193 Colo. 536, 569 P.2d 319 (1977); *Robinson v. City of Boulder,* 190 Colo. 357, 547 P.2d 228 (1976); *Colorado Open Space Council, Inc. v. City & County of Denver,* 190 Colo. 122, 543 P.2d 1258 (1975); *City of Pueblo v. Flanders,* 122 Colo. 571, 225 P.2d 832 (1950).

Without going into great detail, we think it is obvious that the state also has a demonstrable interest in the provision of water by municipalities to users living outside their boundaries. This is evident from the General Assembly's enactment of extensive legislation, in accordance with the constitution, providing for the determination of rights to and the means for the distribution of the state's scarce supply of water among the many competing interests, including provisions for metropolitan water districts. *See, e.g.,* part 4 of art. 4 of title 32, 13 C.R.S. (1973 and 1984 Supp.) (providing for the creation of metropolitan water districts); art. 41 of title 37, 15 C.R.S. (1973 and 1984 Supp.) (Irrigation District Law of 1905); art. 42 of title 37, 15 C.R.S. (1973 and 1984 Supp.) (Irrigation District Law of 1921); art. 45 of title 37, 15 C.R.S. (1973 and 1984 Supp.) (Water Conservancy Act); arts. 46, 47 and 48 of title 37, 15 C.R.S. (1973 and 1984 Supp.) (establishing three water conservation districts); art. 80 of title 37, 15 C.R.S. (1973 and 1984 Supp.) (providing for the office of state engineer); art. 82 of title 37, 15 C.R.S. (1973 and 1984 Supp.) (providing for appropriation and use of water); art. 90 of title 37, 15 C.R.S. (1973 and 1984 Supp.) (Colorado Ground Water Management Act); art. 92 of title 37, 15 C.R.S. (1973 and 1984 Supp.) (Water Right Determination and Administration Act of 1969); and art. 95 of title 37, 15 C.R.S. (1984 Supp.) (Colorado Water Resources and Power Development Authority Act).

We have observed that when a city undertakes to supply water outside its boundaries, it is acting in a proprietary capacity. *Colorado Open Space Council v. Denver,* 190 Colo. at 124–25, 543 P.2d at 1260; *County of Larimer v. City of Fort Collins,* 68 Colo. 364, 367, 189 P. 929, 930 (1920). In this capacity, the municipality is subject to the authority of the General Assembly.

However, rather than enacting legislation that conflicts with Denver's exercise of the power to provide water to users outside its boundaries, the state has expressly authorized this extraterritorial water service by statute. Section 31–15–708(1)(d), 12 C.R.S. (1977), provides:

(1) The governing body of each municipality has the power:

\* \* \* \* \* \*

(d) To supply water from its water system to consumers outside the municipal limits of the municipality and to collect such charges upon such conditions and limitations as said municipality may impose by ordinance.

This statute was first enacted in 1911 and was in effect in substantially the present form in 1956 when Denver claims to have initiated the appropriations at issue in the present litigation. Ch. 175, sec. 1, 1911 Colo.Sess.Laws 522, 522; codified in 1956 at § 139–32–1(39), 6 C.R.S. (1953). *See also* §§ 30–20–402(1)(b) and 31–35–402(1)(b), 12 C.R.S. (1977) (authorizing, respectively, counties and municipalities "[t]o operate and maintain water facilities ... for [their] own use and for the use of public and private consumers and users within and without the territorial boundaries" of the county or municipality); *Colorado Open Space Council v. Denver,* 190 Colo. at 124, 543 P.2d at 1259–60.

Thus, Denver has authority under the constitution, the state statutes and its charter to provide water to users outside its boundaries. As a consequence, Denver necessarily has the power to appropriate water for such a purpose and, contrary to

the conclusion of the referee and the district court, is not precluded from forming the requisite intent for a valid appropriation simply because "the water claimed would not be used within the City and County and is not needed for the future development of the City and County."

The District asserts, however, that a provision of the Colorado Constitution specifically prohibits Denver from providing water to users outside its boundaries except where that activity is incidental to the primary purpose of serving Denver users. The District relies on the following language from article XX, section 1 of the Colorado Constitution:

[The City and County of Denver] shall have the power, within or without its territorial limits, to construct, condemn and purchase, purchase, acquire, lease, add to, maintain, conduct, and operate water works, light plants, power plants, transportation systems, heating plants, and any other public utilities or works or ways local in'use and extent, in whole or in part, and everything required therefore [sic], *for the use of said city and county and the inhabitants thereof....* (emphasis added)

We have never before read, and do not now read, this constitutional provision as preventing Denver from providing water to users outside its boundaries. *See Cottrell v. Denver,* 636 P.2d at 707; *Colorado Open Space Council v. Denver,* 190 Colo. at 123, 543 P.2d at 1259. The above-quoted provision is one of a number of specific grants of power to the City and County of Denver in section 1 of article XX of the Colorado Constitution. These specific grants do not preclude Denver from exercising power, like every other home rule city, over all matters of local and municipal concern pursuant to section 6 of article XX. *Karsh v. City & County of Denver,* 176 Colo. 406, 411, 490 P.2d 936, 939 (1971) ("The enumerated purposes of § 1 were superseded by the general § 6 standard of local and municipal matters."). We have already determined that the provision of water to users outside city boundaries, as

contemplated here by Denver, is a matter of local and municipal concern, although not exclusively so.

Next, the District argues that Denver is restricted by its own charter from appropriating and supplying water to users outside its boundaries. As noted above, charter section C4.26 provides that the Board has the power to lease water and water rights for use outside the limits of Denver with the restriction that such leases "shall provide for limitations of delivery of water to whatever extent may be necessary to enable the Board to provide an adequate supply of water to the people of Denver...." The District does not argue, and the record (including the sample lease contracts admitted into evidence) does not indicate, that Denver will provide water in violation of this charter provision. Nor does this charter provision in any way prevent Denver from appropriating an amount of water, to be used outside its boundaries, in excess of the amount that the Board projects will be needed for use within the limits of Denver. To the contrary, the language of section C4.26 of the Denver Charter implicitly allows such action by the Board, as long as the Board takes the proper steps to restrict leases of such rights in accordance with that section. *See Cottrell v. Denver; Colorado Open Space Council v. Denver.*

The District notes that charter section C4.26 was adopted in 1959, and that in 1956, when Denver claims to have initiated the first of these appropriations, the relevant charter provision was more restrictive. Charter section C297B then provided, in part:

[The Board of Water Commissioners] may temporarily lease water and water rights to be used outside the limits of the city and county of Denver when the water supply for the city and county of Denver and its inhabitants is above that necessary for its present needs; said leases, however, to be for periods not exceeding one year and to be made subject to the future needs and requirements of the city and county and its inhabitants.

As with the present charter section C4.26, this former charter provision did not preclude Denver from providing water to users outside its boundaries except to the extent that by doing so it could not supply its own inhabitants. The mandated lease contract restrictions did not prevent Denver from forming an intent in 1956 to appropriate an amount of water for use, in part or in whole, outside Denver as long as Denver had satisfied itself that it had adequately provided a supply for its own inhabitants. Section C297B merely required that all leases of water and water rights for use outside the city contain the restrictions prescribed by that charter provision.

In further support of its argument that the Denver Charter precludes appropriations by Denver to supply users outside its boundaries, the District calls our attention to *Cottrell v. Denver*, 636 P.2d 703 (Colo. 1981). In that case, we considered section C4.22 of the Denver Charter, providing for the fixing of water rates within Denver "sufficient to pay for operation, maintenance, reserves, debt service, additions, extensions, betterments, *including those reasonably required for the anticipated growth of the Denver metropolitan area,* and to provide for Denver's general welfare." 636 P.2d at 705 (emphasis added). We there held that section C4.22 is not a source of authority for operation of a "metropolitan water works," i.e., one "designed to serve the entire metropolitan area without relation to, or limitation by, the needs of Denver and its citizens." 636 P.2d at 705-07, 705 n. 3. As a result of that holding, we found it unnecessary to consider whether a charter authorization for operation of such a water works would exceed the powers granted to Denver by article XX, section 1 of the Colorado Constitution, as certain Denver residents claimed.

The evidence in the case now before us establishes without contradiction that Denver, in applying its claimed conditional water rights to beneficial use, will supply water within an area that is contiguous to Denver and that has an economic and social fabric of a piece with that of the core city. Based on this evidence, the referee made a finding, adopted by the district court, confirming the Board's legislative determination that Denver citizens would benefit by providing water to this area. The district provided no evidence that would cast doubt on the accuracy of this legislative determination.

Thus, Denver is not seeking to serve an area "without relation to" the needs of Denver and its citizens through use of the conditional water rights claimed here and is not planning the type of "metropolitan water works" for which we found no charter authority under section C4.22 in *Cottrell v. Denver*. Instead, the Board is engaged in a matter of local concern in planning to provide water to an area whose economic and social welfare is intimately related to that of Denver. The Board is fully authorized to do so by section C4.18 of the Denver Charter and by that charter as a whole. Moreover, as we have stated earlier, Denver has constitutional authority to act in matters of local concern unless *limited* by its charter. Here, the charter not only contains no limitation on Denver's ability to act in providing water within areas of its legitimate local concern, but in fact provides further authorization for such action.

Finally, and relatedly, the District argues that Denver's power to lease water for use outside the city is limited to "surplus" water. The District apparently defines "surplus" water as water not presently needed for use within the boundaries of Denver but that will be needed, with certainty, for such use in the future. The District then declares that the water Denver claims to have appropriated here is not "surplus" water, as it will never be needed for use within the boundaries of Denver.

Even if the water involved here is not "surplus" water as defined and characterized by the District, there is nothing in the constitution, the state statutes, Denver's charter, or the relevant case law that restricts Denver to "surplus" water as its source of supply for users outside its boundaries. The record shows that the provision of water as contemplated here by

Denver will be of benefit to Denver and therefore is a matter of local and municipal concern. Thus, Denver has authority by virtue of section 6 of article XX of the Colorado Constitution to appropriate and supply this water to users outside its boundaries. In addition, the relevant state statute provides simply that a city may "supply water from its water system to consumers outside the municipal limits of the municipality" without any limitation or restriction to "surplus" waters. § 31–15–708(1)(d), 12 C.R.S. (1977). *See also* § 31–35–402(1)(b), 12 C.R.S. (1977). Denver's charter simply requires that the Board insert in every water lease a provision limiting delivery of water to the extent necessary to ensure an adequate supply of water to the people of Denver. Denver Charter, sec. C4.26. This charter provision does not limit Denver's ability to provide water outside its boundaries to an amount that it projects with certainty that it will need to rely upon for use within the limits of Denver in the future.

While certain authorities cited by the District may have involved the issue of the power of a municipality to distribute "surplus" water (as defined by the District) outside its boundaries, no decision has held that Denver or any other municipality was limited *solely* to "surplus" waters in providing a water supply outside its boundaries. *See Cottrell v. Denver; Robinson v. Boulder; Colorado Open Space Council v. Denver.* As we have demonstrated, such a limitation would be contrary to the constitution and statutes of Colorado.

In conclusion, we hold that Denver has the authority and capacity, under the Colorado Constitution, the Colorado statutes and its own charter, to provide water to users outside its political boundaries in the manner contemplated here. In the exercise of that authority, Denver had the power, as a matter of law, to form the necessary intent to appropriate water for this purpose in the proceedings now before us. Whether Denver actually formed the proper intent to appropriate water will be addressed in the next two parts of this opinion.

## IV.

■ This court has long recognized that the priority date of an appropriation will relate back to the date on which an appropriator took the first step to secure a water right as long as the application of water to beneficial use is completed with reasonable diligence. *Sieber v. Frink,* 7 Colo. 148, 153, 2 P. 901, 903 (1884). The relation-back doctrine remains valid today. *See City of Aspen v. Colorado River Water Conservation District,* 696 P.2d 758, 761 (1985). A judicial decree recognizing the existence of such an uncompleted appropriation has been styled a "conditional" decree. *See, e.g.,* ch. 147, secs. 1, 5–7, 1919 Colo.Sess. Laws 487, 487–88, 491–95 (part of what was known as the Adjudication and Limitation Act of 1919). The property right established is known as a "conditional water right," affording the owner "a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation...." § 37–92–103(6), 15 C.R.S. (1973).

■ We analyzed the requirements for and purposes underlying a conditional decree in *Aspen v. Colorado River Water Conservation District.* There, we emphasized that a conditional water right becomes established upon the concurrence of an *intent to appropriate* water and the *performance of overt acts* in furtherance of that intent. Intent to appropriate requires a fixed purpose to pursue diligently a certain course of action to take and beneficially use water from a particular source. *Fruitland Irrigation Co. v. Kruemling,* 62 Colo. 160, 165–67, 162 P. 161, 163 (1916). The overt acts must be "of such character as to manifest the necessary intent, to demonstrate that a substantial step toward the application of water to beneficial use has been taken, and, most importantly, to constitute notice to interested persons of the nature and extent of the proposed demand upon the water supply." *Aspen v. Colorado River Water Conservation District,* at 762–63. We commonly have referred to this concurrence of intent and

overt acts as a "first step" toward an appropriation. In *Aspen v. Colorado River Water Conservation District*, we quoted with approval the following passage from *Fruitland Irrigation Co. v. Kruemling*, 62 Colo. at 165–66, 162 P. at 163:

> Certainly the first step demanded by the rule is nothing short of an open and notorious physical demonstration, conclusively indicating a fixed purpose to diligently pursue and, within a reasonable time, ultimately acquire a right to the use of water, and as its primary function is to give notice to those subsequently desiring to initiate similar rights, it must necessarily be of such a character that they may fairly be said to be thereby charged with at least such notice as would reasonably be calculated to put them on inquiry of the prospective extent of the proposed use and consequent demand upon the water supply involved. [Citation omitted]. The $5.00 worth of work done on the reservoir site in the form of moving earth and rock late in the spring or early in the summer of 1900, admittedly a mere token, did not, considered with other facts disclosed, meet the requirement. Neither did the bare fact of purchase of lands a little later do so. The matter does not rest upon the intent of the claimant, but rather upon such outward, physical acts and manifestations in pursuance of such intent as may be deemed sufficient to constitute notice to all who may come. This doctrine is for the benefit of the claimant, and any tendency toward its abuse should be carefully scrutinized, lest injury result to the public in general in the exercise of the inherent right to divert and appropriate water to beneficial uses, in the light of conditions apparently existing at the time, free from the burden of anticipating the purposes and claims of others, not sufficiently indicated by such physical acts as would charge ordinary intelligence with the nature, purpose and effect thereof.

*Aspen v. Colorado River Water Conservation District*, at 762.

In the final analysis, the determination of whether the requisite first step has been taken must be made on an ad hoc basis, taking into account the particular facts in each case. *Aspen v. Colorado River Water Conservation District*, at 761; *Colorado River Water Conservation District v. Vidler Tunnel Water Co.*, 197 Colo. 413, 417, 594 P.2d 566, 568 (1979).

We turn now to Denver's claims. The district court adopted the following conclusion of law when adopting the referee's report:

> Because there has been no demonstration that the Board of Water Commissioners of the City and County of Denver formed a specific and definite intent as of the dates claimed or at any time thereafter to proceed with those projects described in the statements of claim, there can be no application of the doctrine of relation back for an appropriation as of those dates or at any subsequent date, and there can be no finding that an appropriation has been made.

Because of his conclusion concerning the first, or intent, prong of the conditional decree requirements, the referee ruled that Denver had not accomplished a valid first step with respect to any of its claims. For this reason, the referee declined to make a specific finding of fact or conclusion of law concerning the second prong, the sufficiency of any overt acts performed by Denver.

Denver challenges this conclusion concerning intent and asserts that it formed the necessary intent as of the dates claimed. Denver also claims that the record shows that it performed certain overt acts consistent and concurrent with that intent. Thus, according to Denver, an effective "first step" was taken toward the various appropriations so that it was entitled to the requested conditional decrees.

After reviewing the memorandum of law on intent included as part of the referee's partial report, we reverse certain of his conclusions to the extent described below in this part IV. We determine that the referee's conclusions concerning the absence of the formation of intent by Denver

were based in part on several mistaken notions of law, and this provides the basis for our reversal. To the extent that the referee's factual findings are incomplete, uncontroverted evidence in the record establishes the facts necessary to enable us to resolve the first step issues without necessity for remand.

We reserve for consideration in part V the question whether Denver had the requisite contractual or agency relationships with users outside its boundaries to support a valid intent to appropriate, as required by *Colorado River Water Conservation District v. Vidler Tunnel Water Co.*, 197 Colo. 413, 416–18, 594 P.2d 566, 567–69 (1979). All of our discussions of intent in this part IV are subject to the caveat that the *Vidler* intent question remains to be reviewed later.

We will address each claim separately.

### A. Roberts Tunnel Collection System Claims.

#### 1. Straight Creek Conduit.

Denver claims that the necessary intent to divert water from Straight Creek was

formed on October 23, 1956, when the Board passed a resolution which reads, in relevant part:

> It was thereupon regularly moved, seconded and unanimously carried, that the operating personnel be and they were authorized and directed to at once initiate and carry forward those steps necessary to cause the appropriation on behalf of the City and County of Denver, for control through the Board of Water Commissioners, of all possible raw water out of the Colorado River, and its tributaries, including water for direct and immediate use and water to be stored by exchange, replacement, and other uses which appear to be within the limits of economic feasibility.

We agree with the referee's conclusion that this resolution is wholly insufficient to indicate the formation of a fixed purpose to appropriate water from Straight Creek.[13] *See Fruitland Irrigation Co. v. Kruemling*, 62 Colo. at 165–67, 162 P. at 163. Its language is simply too broad and lacking in specificity to support the particular appropriation claimed.

---

**13.** The referee concluded that an appropriator must form an intent to divert a definite volume of water at a definitely located point, citing language to that effect in *City & County of Denver v. Northern Colorado Water Conservancy District*, 130 Colo. 375, 393, 276 P.2d 992, 1001 (1954). *See also Lionelle v. Southeastern Colorado Water Conservancy District*, 676 P.2d 1162, 1168 (Colo.1984) and *Rocky Mountain Power Co. v. Colorado River Water Conservation District*, 646 P.2d 383, 387 (Colo.1982) (first step consists, in part, of intent to appropriate "definite quantity" of water and an overt manifestation of that intent). The holding in *Denver v. Northern Colorado Water Conservancy District* is in conflict with the holdings, the result, or both reached in *Harvey Land & Cattle Co. v. Southeastern Water Conservancy District*, 631 P.2d 1111, 1114 (Colo.1981); *Four Counties Water Users Association v. Colorado River Water Conservation District*, 159 Colo. 499, 414 P.2d 469 (1966); *Metropolitan Suburban Water Users Association v. Colorado River Water Conservation District*, 148 Colo. 173, 365 P.2d 273 (1961); and *Taussig v. Moffat Tunnel Water & Development Co.*, 106 Colo. 384, 393, 106 P.2d 363, 367 (1940). The key is that the appropriator must provide interested persons with notice "of such a character that they may fairly be said to be thereby charged with at least such notice as would rea-

sonably be calculated to put them on inquiry of the prospective extent of the proposed use and consequent demand upon the water supply involved." *Fruitland Irrigation Co. v. Kruemling*, 62 Colo. 160, 165, 162 P. 161, 163 (1916). We agree with the referee's conclusion that the Board's October 1956 resolution lacks the necessary specificity as to source and amount to satisfy the above-quoted requirement from *Fruitland Irrigation Co. v. Kruemling*. Nor does the generally worded resolution manifest the necessary intent, i.e., a fixed purpose to diligently pursue a right to the use of water. *See, id.* However, we decline to endorse the referee's conclusion that in every case, a would-be appropriator must determine the *exact* amount of water to be diverted at a *precisely located* point of diversion before that appropriator can form the necessary intent to appropriate or provide sufficient notice to others. Rather, the determination must always be made on an ad hoc basis, taking into account whether the particular facts of each case satisfy the purposes underlying the requirements of the first step test. *See infra* at 750–51, 753; *Aspen v. Colorado River Water Conservation District*, 696 P.2d at 762 (decided this day); *Colorado River Water Conservation District v. Vidler Tunnel Water Co.*, 197 Colo. 413, 417, 594 P.2d 566, 568 (1979). *See also Fruitland Irrigation Co. v. Kruemling*.

However, by the time Denver filed its map and statement with the state engineer, the necessary intent had been formed. The map and statement, accepted for filing by the state engineer on January 21, 1957, show the alignment of the conduit, the location of a diversion point based on a field survey, and the rate at which water is to be diverted from Straight Creek. The filing of a map and statement constitutes prima facie evidence of the necessary intent on the part of an appropriator. § 148-4-6, 7 C.R.S. (1963) (repealed 1969); *Central Colorado Water Conservancy District v. City & County of Denver,* 189 Colo. 272, 275, 539 P.2d 1270, 1272 (1975). Such evidence can be rebutted by other evidence presented to the court, *City & County of Denver v. Northern Colorado Water Conservancy District,* 130 Colo. 375, 393, 276 P.2d 992, 1001–02 (1954), but the record in this case is devoid of any such rebuttal. The fact that Denver added an alternate point of diversion for the Straight Creek Conduit when filing its statement of claim in the supplemental adjudication suit in 1968 does not evince a lack of the requisite intent as of 1957. The alternate diversion point reflects a further refinement of the project, not a lack or shift of the necessary intent. *See Four Counties Water Users Association v. Colorado River Water Conservation District,* 159 Colo. 499, 514–15, 414 P.2d 469, 477–78 (1966).

The formation of the necessary intent to appropriate may succeed the performance of those overt acts that serve the purposes of demonstrating that a substantial step has been taken toward application of water to beneficial use and of putting others on notice of the prospective demand upon the water supply. *Twin Lakes Reservoir & Canal Co. v. City of Aspen,* 192 Colo. 209, 214–15, 557 P.2d 825, 828–29 (1976); *Elk-Rifle Water Co. v. Templeton,*

173 Colo. 438, 446, 484 P.2d 1211, 1215 (1971). Here, the detailed field survey begun on November 7, 1956, was a sufficiently substantial step by Denver in pursuit of the Straight Creek Conduit diversion and, at a minimum, provided sufficient notice that Denver was contemplating an appropriation in that drainage basin. The subsequent filing of the map and statement completed the requisite overt acts by manifesting the formation of the necessary intent to appropriate.

In a memorandum of law, the referee concluded that Denver never formed the necessary intent to appropriate water from Straight Creek because there was no "evidence that the Board subsequently met to decide definitely to proceed with ... the Straight Creek Conduit [project] depicted in the preliminary filing maps," citing for authority *Elk-Rifle Water Co. v. Templeton.* In that case, officials of the corporate applicant met and decided to undertake a diversion and storage project after the project had been outlined by an engineer following preliminary field survey and engineering work. We held that the applicant formed the necessary intent to appropriate at the time the officials met and reached their decision and that the formation of the intent could follow the requisite overt acts, the priority date representing the concurrence of the two. 173 Colo. at 446, 484 P.2d at 1215. *See also Twin Lakes Reservoir & Canal Co. v. Aspen.*[14]

As noted above, Denver formed the necessary intent as manifested by the 1957 filing after performing the requisite overt acts, in conformity with the rule from *Elk-Rifle* and *Twin Lakes.* It was not necessary in this case for the Board to meet and officially decide to proceed with the Straight Creek Conduit. The Board had properly delegated authority to make this specific determination to the staff of the

---

14. By establishing the priority date of the conditional water right recognized in *Elk-Rifle Water Co. v. Templeton* as the date that the officials of the corporate applicant met in private to decide to proceed with the project, we failed to note the absence of any overt act by the applicant as of that date manifesting the newly-formed intent.

The proper priority date in *Elk-Rifle* should have been the date of the filing of the application for a conditional decree, as that act completed the necessary overt acts by manifesting the formation of the requisite intent. *See Twin Lakes Reservoir & Canal Co. v. City of Aspen,* 192 Colo. 209, 557 P.2d 825 (1976).

Denver Water Department as an administrative function after expressing its legislative policy in the October 23, 1956, resolution. *See* Denver Charter, sec. C4.19, which prescribes the structure of the Denver Water Department and details the powers of the Board over the Department.[15]

### 2. East Gore Range Canal.

■ We affirm the water court's ruling that Denver had not initiated an appropriation for the East Gore Range Canal portion of the Roberts Tunnel Collection System when the evidence was closed in 1975. The evidence reflects that Denver has never formed or demonstrated a fixed and definite purpose to undertake the East Gore Range Canal project.

For the reasons noted above, the October 23, 1956, resolution of the Board did not exhibit the necessary specificity to show an intent to divert water from the various creeks along the length of the subsequently proposed East Gore Range Canal. Then, from 1956 through 1975 Denver performed little work to initiate and achieve the diversion and beneficial use of water from the approximately 20 streams along the length of the proposed 40-mile canal, except for one 2½ mile survey in 1956 and some later minor stream gauging activity. A survey of a small but significant portion of a 40-mile canal that will divert water from one source might constitute a sufficient overt act to establish a conditional water right by manifesting the necessary intent, demonstrating substantial progress toward application of water to beneficial use, and giving notice of the proposed demand upon the water supply. However, when, as here, the project contemplates the diversion of water out of numerous streams lying along the course of the canal, such a minimal

survey cannot be considered sufficient to serve the important purposes of the overt acts requirement. Furthermore, while the filing of the map and statement in 1957 and the filing of the statement of claim in 1968 may be considered prima facie evidence of intent, the prima facie case so created is rebutted here by Denver's failure to take any other action demonstrating a fixed purpose to complete the appropriation during the long period that has elapsed since the 1957 filing. *Cf. Central Colorado Water Conservancy District v. Denver,* 189 Colo. at 275, 539 P.2d at 1272; *Denver v. Northern Colorado Water Conservancy District,* 130 Colo. at 393, 276 P.2d at 1001–02.

### 3. Piney River Unit.

We again agree with the referee and the water judge that the October 23, 1956, resolution of the Board is not sufficiently specific to demonstrate the requisite intent by Denver to appropriate water from the Piney River and its tributaries for the Piney River Unit of the Roberts Tunnel Collection System.

■ We also agree with the referee's conclusion, in his memorandum of law, that the November 1956 survey by Denver of the Straight Creek Conduit and a portion of the East Gore Range Canal, both in the Blue River drainage basin, was not evidence of an intent on the part of Denver to appropriate water from streams in the far distant Piney River drainage basin. *Denver v. Northern Colorado Water Conservancy District,* 130 Colo. at 390, 276 P.2d at 1000. We continue to adhere to the principle stated in *Metropolitan Suburban Water Users Association v. Colorado River Water Conservation District,* 148 Colo. 173, 202–03, 365 P.2d 273, 289 (1961) (*Met-*

15. Section C4.19 of the Charter of the City and County of Denver reads in relevant part:

The property and personnel under control of the Board shall be referred to generally as the Denver Water Department or Water Department. The Board shall designate some person as Manager of the Water Department and shall designate an appropriate person or persons to act as such manager in case of the absence or unavailability of the Manager of

the Department. The Manager shall cause the Board's policies and orders to be executed and shall bring to the Board's attention matters appropriate for its action.... The Board shall define the duties of each of its employees and fix their compensation, all conduct by both the Board and its employees to be with the purpose of furnishing good and continuous water service.

*ropolitan Suburban*), that work accomplished on one portion of an integrated project may be considered evidence of reasonable diligence on the part of the appropriator as to another portion of the project, even in another drainage basin, if the portion on which the work is done must necessarily be constructed in order that the second portion may be successfully operated. (As will be discussed below, we disagree with the manner in which the principle was applied in *Metropolitan Suburban.*) However, work performed by Denver on the Straight Creek Conduit and the minimal work performed on the East Gore Range Canal had nothing directly to do with appropriations out of the Piney River and its tributaries. It is entirely unnecessary, in view of the design of the Roberts Tunnel Collection System, that the Straight Creek Conduit or East Gore Range Canal projects *ever* exist for water to be diverted from the Piney River Unit and transported to Denver. Thus, work performed on the Straight Creek Conduit and East Gore Range Canal projects neither initiated nor furthered the Piney River Unit in any manner.

Denver's filing of the map and statement in 1957, depicting the various components of the Piney River Unit on the map and listing the amounts to be diverted from various streams, is prima facie evidence that Denver formed the necessary intent to appropriate. § 148–4–6, 7 C.R.S. (1963) (repealed 1969); *Central Colorado Water Conservancy District v. Denver*, 189 Colo. at 275, 539 P.2d at 1272. However, this filing was not independently sufficient to serve as the requisite overt act. *Central Colorado Water Conservancy District v. Denver*, 189 Colo. at 275, 539 P.2d at 1272. The map was based on previous studies and maps not performed or created by Denver. Although the filing of the map and statement served one of the important purposes of the overt act requirement, manifestation of the necessary intent, Denver at that time had not performed any other overt act demonstrating a substantial step toward

application of the water to beneficial use or providing notice to interested persons. *See Bunger v. Uncompahgre Valley Water Users Association*, 192 Colo. 159, 166–68, 557 P.2d 389, 393–95 (1976); *Fruitland Irrigation Co. v. Kruemling*, 62 Colo. at 165–67, 162 P. at 163.

Later in 1957, Denver began field work to establish the location of the west portal of the Vail Pass Tunnel, the portion of the tunnel that is within the Eagle River drainage basin. Denver intends that this tunnel will be the link bringing water from the Eagle River Unit into the Blue River drainage basin and thence into Dillon Reservoir. Water from the Piney River Unit will be taken by tunnel into the water transportation facilities of the Eagle River Unit and will also pass through the Vail Pass Tunnel. Denver did not begin any actual work in the Piney River basin or directly concerning the Piney River Unit until the 1960s.

As we noted above, once Denver initiated appropriations in the Piney River basin, work on other portions of the Roberts Tunnel Collection System that were clearly integrated and necessary for the success of the Piney River Unit could be evidence of Denver's *diligence* in pursuing the Piney River portion of the project. *Metropolitan Suburban*, 148 Colo. at 202–03, 365 P.2d at 289. But Denver's work on the Vail Pass Tunnel in an entirely different drainage basin did not provide notice to anyone of the nature of Denver's intended claim in the Piney River basin so as to *initiate* the appropriation. *Denver v. Northern Colorado Water Conservancy District*, 130 Colo. at 390, 276 P.2d at 1000; *Fruitland Irrigation Co. v. Kruemling*, 62 Colo. at 165–67, 162 P. at 163.

▮▮ However, we have no hesitation in concluding that Denver did perform the overt acts necessary for initiating an appropriation for the Piney River Unit when it began field survey work in the Piney River basin in 1964 or 1965,[16] work which includ-

---

**16.** Testimony from Denver's witnesses was indefinite and inconsistent as to whether Denver

initiated field survey work in the Piney River basin and located the dam axis of the proposed

ed the location of the dam axis of the proposed Piney Reservoir. The referee considered it significant that Denver did not locate precise diversion points in the Piney River Unit before 1967 at the earliest. Whether diversion points have been located has evidentiary value, but an absence of a precise location does not automatically preclude a conditional decree. A would-be appropriator must give some notice to others of the claim upon the water from a particular source to establish a conditional water right; locating the diversion points with absolute specificity is not required. *Taussig v. Moffat Tunnel Water & Development Co.*, 106 Colo. 384, 392–93, 106 P.2d 363, 367 (1940). *See also Harvey Land & Cattle Co. v. Southeastern Colorado Water Conservancy District,* 631 P.2d 1111, 1114 (Colo.1981); *Fruitland Irrigation Co. v. Kruemling,* 62 Colo. at 165–67, 162 P. at 163. *But see Denver v. Northern Colorado Water Conservancy District,* 130 Colo. at 393, 276 P.2d at 1001.

■ The performance of the survey in the Piney River basin constituted the required overt action and concurred with the intent earlier formed by Denver to appropriate water for the Piney River Unit as shown by the development and filing of the basic plan reflected in the 1957 map and statement filing. This proof established Denver's first step toward the Piney River Unit appropriations sometime in 1964 or 1965. The record, however, does not indicate the exact day in 1964 or 1965 on which the field survey work began. On remand, if the water court determines that Denver has satisfied the requirements outlined in part V of this opinion, the court should take evidence to establish that exact date.

Finally, the referee again determined that Denver had not formed the necessary intent to appropriate water for the Piney River Unit because the Board did not meet and specifically decide to proceed with the

project after the field survey work. This is a conclusion that we decline to follow, as a matter of law, for the reasons given above.

In conclusion, we reverse the water court in part and hold that Denver satisfied the necessary requirements for initiating an appropriation, with the caveat for the issue discussed in part V below, for the Straight Creek Conduit portion of the Roberts Tunnel Collection System as of January 21, 1957, and for the Piney River Unit of the Roberts Tunnel Collection System upon the initiation of field survey work sometime in 1964 or 1965, the exact date to be determined by the water court on remand. We also hold that Denver never formed the requisite intent or performed the necessary overt acts to initiate an appropriation for the East Gore Range Canal.

To the extent that we hold that Denver did not initiate an appropriation for all three portions of the Roberts Tunnel Collection System involved here as of November 7, 1956, we do not follow the result reached in *Metropolitan Suburban.* 148 Colo. at 180–81, 200–03, 365 P.2d at 277, 288–89. In *Metropolitan Suburban,* the fourth portion of the Roberts Tunnel Collection System, the Eagle River Unit in the Eagle River basin, was recognized as an initiated appropriation as of the date of commencement of the survey by Denver of the Straight Creek Conduit in the Blue River basin—the same facts as are involved in the conditional water right adjudications from Water Districts Nos. 36 and 52 now before us. (*Metropolitan Suburban* arose out of an adjudication proceeding in Water District No. 37, in which Denver filed its claims early in 1957.) Our reasons for rejecting the result reached in *Metropolitan Suburban* follow.

■ First, as discussed above, *Metropolitan Suburban* held that work performed on one portion of a project could

Piney Reservoir in 1964 or 1965. The referee made a finding of fact that the dam axis was located in 1965 and a somewhat inconsistent finding of fact that the field surveys performed by Denver were "not sufficient until 1964 or 1965" to provide the field basis for the informa-

tion shown in the 1957 map and statement filed by Denver with the state engineer. The date Denver commenced significant field work on the Piney River appropriations should be clarified on remand.

constitute the necessary *reasonable diligence* toward completing another portion of the same integrated project, even if the second portion is in another drainage basin. *Metropolitan Suburban,* 148 Colo. at 202–03, 365 P.2d at 289. However, *Metropolitan Suburban* did not explicitly address the application of this principle to the *initiation of the appropriation*—a wholly separate and distinct issue—although by its result *Metropolitan Suburban* permitted work in one drainage basin to serve as the overt act initiating an appropriation in a separate basin. With the issue squarely presented in the present case, we decline to extend the *Metropolitan Suburban* principle to permit such a result. Work in one drainage basin, without more, cannot provide the necessary notice or manifest the required fixed purpose to initiate an appropriation of water out of a wholly separate drainage basin, no matter how integrated the proposed projects may be in theory and ultimate development. To hold otherwise would ignore long-standing principles concerning the requirements and purposes underlying the relation-back doctrine. *See Aspen v. Colorado River Water Conservation District,* at 762; *Fruitland Irrigation Co. v. Kruemling,* 62 Colo. at 165–67, 162 P. at 163.

Furthermore, the filing of the map and statement in 1957, while providing evidence of intent, neither constituted sufficient notice to interested parties of Denver's claims nor showed that any substantial step had been taken toward initiating those appropriations. This is not to say that an appropriation can never be initiated without the performance of overt acts "on the land" in the proper drainage basin. We rejected the notion that activity "on the land" is an absolute necessity in *Aspen v. Colorado River Water Conservation District,* at 764–65. However, the acts performed must be substantial and specific to the source in order to serve the essential purposes of the overt acts requirement and thus to initiate the appropriation.

Second, *Metropolitan Suburban* did not analyze or even mention the October 23, 1956, resolution of the Board, although the decision implicitly assumed that Denver had formed the necessary intent as of the adoption of that resolution, since no other demonstration of intent preceded the overt act of initiation of the field survey on November 7, 1956, the priority date awarded to Denver. *See Metropolitan Suburban,* 148 Colo. at 180–81, 200–03, 365 P.2d at 277, 288–89. As previously explained, however, an analysis of the Board's resolution shows that the necessary fixed intent to appropriate water from particular sources of water is not demonstrated by this resolution. An expressed desire to appropriate "all possible raw water out of the Colorado River and its tributaries" is nothing but a generalized wish, not an expression of a definite fixed purpose to take and use water from any particular source or place.

Third, an analysis of the facts and the record concerning the East Gore Range Canal, not part of the Roberts Tunnel Collection System analyzed in *Metropolitan Suburban,* shows that, as of the completion of the presentation of evidence in 1975, Denver had done little to advance this project since its conception on paper. We believe this to be a relevant consideration in making the ad hoc first step determination that our cases require. *See Aspen v. Colorado River Water Conservation District,* at 761; *Colorado River Water Conservation District v. Vidler Tunnel Water Co.,* 197 Colo. at 417, 594 P.2d at 568.

Fourth, and finally, our decision in *Metropolitan Suburban* does not indicate that Denver demonstrated compliance with the conditional water right requirements we later analyzed in *Colorado River Water Conservation District v. Vidler Tunnel Water Co.,* 197 Colo. at 416–18, 594 P.2d at 567–69, requirements that we discuss separately in part V of this opinion. Our holding in *Vidler* was not the articulation of a new principle of law. Rather, it involved the application of long-standing principles of Colorado water law and is applicable to Denver's claims here. *Rocky Mountain*

*Power Co. v. Colorado River Water Conservation District,* 646 P.2d 383, 389 (Colo. 1982).

### B. Eagle-Colorado Collection System.

### 1. Eagle River Unit.

Denver claims the date of November 23, 1971, for the initiation of the appropriation for the entire Eagle-Colorado Collection System, including the Eagle River Unit of that system. On that date, the Board adopted the following resolution:

It was thereupon moved, seconded and unanimously carried that appropriation be made of all of the unappropriated waters of the Colorado River and its tributaries occurring at and above Section 26, Township 2 South, Range 83 West, Sixth Principal Meridian, near State Bridge and all of the unappropriated waters of the Eagle River and its tributaries at and above Section 15 and 16, Township 4 South, Range 83 West, Sixth Principal Meridian and at Section 11 and 12, Township 5 South, Range 82 West, Sixth Principal Meridian near Wolcott, for convenience to be called the Eagle-Colorado Collection Systems, together with all storage facilities necessary, convenient or desirable to assist in controlling the above mentioned waters, and, particularly, a reservoir to be formed by the creation of a dam to be located approsimately [sic] in Sections 9 and 10, Township 4 South, Range 83 West, Sixth Principal Meridian, and for convenience to be referred to as the Eagle-Colorado Reservoir, together with such other appropriations as the staff may find needful or convenient in addition to those particularly specified above.

The referee concluded, in his memorandum of law, that the requisite intent to appropriate water was not demonstrated by the Board's resolution because "neither the Board nor its personnel knew how much unappropriated water was available from the Eagle River or from the Colorado River" and "the Board did not know how much 'unappropriated water' it was seeking to appropriate by its resolution."

Prior to the adoption of section 37–92–305(9)(b) in 1979, a showing of actual, certain availability, or of a good faith belief in the availability, of unappropriated water was not a prerequisite for the establishment of a conditional right to waters from surface streams. *Colorado River Water Conservation District v. Vidler Tunnel Water Co.,* 197 Colo. at 418–19, 594 P.2d at 569–70. *See also Southeastern Colorado Water Conservancy District v. City of Florence,* 688 P.2d 715, 717–18 (Colo.1984). Denver claims to have initiated these appropriations well before 1979. Therefore, the new statutory requirement does not apply, and the referee's conclusion that Denver was required to know with certainty how much unappropriated water was available in the Eagle and Colorado Rivers in order to form the necessary intent to appropriate is in error.

On November 24, 1971, the day following the adoption of the resolution, Denver posted signs at points in the Eagle River drainage basin representing the planned diversion and reservoir sites. Notice was subsequently published in The Denver Post and The Daily Sentinel in Grand Junction. A statement of claim for the Eagle River portion of the Eagle-Colorado Collection System was filed with the court in Water District No. 37 on November 26, 1971. The text of the signs, published notices and statement of claim consisted of paraphrases of pertinent parts of the resolution. The statement of claim, however, added a figure representing the maximum amount of water proposed to be diverted from the Eagle River and its Alkali Creek tributary of 2540 cfs. *See Taussig v. Moffat Tunnel Water & Development Co.,* 106 Colo. at 393, 106 P.2d at 367 (to support a conditional decree it is not necessary to form the intent to appropriate a specific amount of water "except the fixing of the maximum amount of water to be diverted"). The resolution, signs, publication and filing together constituted a manifestation of Denver's intent to appropriate water from sufficiently specific locations along the Eagle River. The signs and published notices

also put interested persons on inquiry notice of Denver's proposed demand on the water supply, leading those so notified to the Denver Water Department and, hence, to the statement of claim filed by Denver which included the maximum amount of water proposed to be diverted. *See Fruitland Irrigation Co. v. Kruemling,* 62 Colo. at 165, 162 P. at 163.

However, it was not until Denver began the field survey work on November 28, 1971, which included the location of the Eagle River pump diversion point and the dam axis of the Eagle-Colorado Reservoir, that Denver completed the requisite overt acts by taking a substantial step toward application of the water to beneficial use. *See Fruitland Irrigation Co. v. Kruemling,* 62 Colo. at 165-67, 162 P. at 163.

The referee further concluded that Denver lacked the requisite intent to appropriate water for the Eagle River Unit of the Eagle-Colorado Collection System because "the evidence demonstrates that Denver had no definite plans as to how to proceed with the project.... This is indicated by the fact that Denver contracted with engineering consultants between 1971 and 1974 for a study to determine the feasibility of the proposed Eagle-Colorado project." Here, the referee's conclusion finds no support in the record.

The record indicates that Denver anticipated, beginning at the moment of the project's conception, that it would bring the water from the Eagle-Colorado system into the transportation facilities of the Roberts Tunnel Collection System west of Vail Pass. The water would then make its way to Denver in the same manner as the other water to be gathered by the Roberts Tunnel Collection System. The filed statement of claim documents such an intention. We disagree with the referee as to the conclusion to be drawn from the 1974 report. The 1974 report from the consultants was commissioned by the Board, at a cost of $1.8 million, to study the feasibility of several alternative operational configurations of the Eagle-Colorado and Eagle-Piney projects. While one alternative that did not incorporate the Eagle-Colorado Collection System in any fashion was analyzed for comparative purposes, the preferred alternative fully integrated the Eagle-Colorado Collection System with the Roberts Tunnel Collection System.

As of mid-1975, the Board had received the report from the consultants, but had not expressed any view concerning it. At all times, however, Denver continued to exhibit a fixed resolve to develop the Eagle-Colorado Collection System and bring the water to Denver; it has merely continued the process of evaluating and selecting the preferred locations and operational configurations. As we stated in *Four Counties Water Users Association v. Colorado River Water Conservation District,* in an analogous situation, the actions taken "result in a more efficient, economical plan; and rather than showing no fixed intention to take, they demonstrate continuous engineering studies with a purposeful, deliberate and diligent effort to take all steps necessary to divert the water and apply it to beneficial use." 159 Colo. at 515, 414 P.2d at 477-78. The project as designed by Denver may never prove economically feasible, but we have held that it is irrelevant whether the trial court believes that the project will prove economically feasible in the end, as long as the appropriator has a fixed purpose to effect the appropriation and diligently pursues that end with a firm resolve. *Four Counties Water Users Association v. Colorado River Water Conservation District,* 159 Colo. at 511-13, 515-16, 414 P.2d at 476-77, 478. *See also Fruitland Irrigation Co. v. Kruemling,* 62 Colo. at 165-67, 162 P. at 163.

Finally, the referee again concluded that Denver had not formed the necessary intent to appropriate water because the Board never met after the performance of the overt acts to decide officially to proceed with the project. We reject this conclusion for reasons earlier stated.

■ In sum, we hold that a conditional decree should be granted to Denver for the Eagle River Unit of the Eagle-Colorado Collection System—if Denver demonstrates

on remand that it has satisfied the requirements discussed in part V of this opinion—with an appropriation date of November 28, 1971, representing the date of the initiation of the field survey.

### 2. *Colorado River Unit.*

We also conclude that Denver formed the necessary intent and performed the necessary overt acts to establish an appropriation for the Colorado River Unit of the Eagle-Colorado Collection System as of November 30, 1971, the date that Denver filed its statement of claim in the supplemental adjudication suit. As noted above, the Colorado River Unit consists of a planned pump diversion point on the Colorado River near State Bridge, the water to be transported into the Eagle River basin and the proposed Eagle-Colorado Reservoir. In the statement of claim, Denver proposed to divert 3,000 cfs from the Colorado River.

All of the conclusions reached by the referee concerning Denver's lack of formation of the necessary intent to appropriate water for the Eagle River Unit of the Eagle-Colorado Collection System, and our analysis and reversal of those conclusions, apply with equal force to the Colorado River Unit. We analyze the Colorado River Unit separately to discuss the sufficiency of the overt acts performed by Denver in initiating the appropriation.

Again, the adoption of the resolution, filing of the claim, posting of the sign, and publishing of the notices manifested Denver's intent to appropriate water from a sufficiently specific point on the Colorado River and transport it to the proposed Eagle-Colorado Reservoir in the Eagle River basin for storage and subsequent transportation to Denver, there to be applied to beneficial use. To serve the essential purpose of manifesting intent, however, the degree of specificity of the location of the diversion points—by sections only—is only minimally adequate. As well, the posting of the signs at the proposed point of diversion along with the publication of the notices is only barely sufficient to serve the overt act's important function of providing notice to interested parties of the proposed demand on the water supply.

As with the Eagle River Unit, the survey and geological work begun on November 28, 1971, which located the dam axis of the Eagle-Colorado Reservoir, constituted an essential element of the necessary overt acts by demonstrating that Denver had gone beyond preliminary or token work and had taken a substantial step toward actually appropriating water for the Colorado River Unit of the Eagle-Colorado Collection System and applying it to beneficial use. *See Fruitland Irrigation Co. v. Kruemling,* 62 Colo. at 165–67, 162 P. at 163. This is true, as will be explained, even though the work was performed in the Eagle River basin rather than in the Colorado River basin where the diversion of water was to occur.

Work on the Eagle-Colorado Reservoir constituted a substantial step toward perfecting the Colorado River appropriation and manifested Denver's intent to complete that appropriation. However, that work did not serve the overt act requirement's additional purpose of providing notice to interested parties of the nature and extent of the proposed demand on the water supply. It was lacking in this respect because the construction of the reservoir would have no apparent relation to a diversion from the Colorado River. For the purpose of notice, the crucial acts supplementing the substantial work performed on the Eagle-Colorado Reservoir in the Eagle River basin are the posting of a sign on the Colorado River in the area of the proposed diversion and the publications of notice of Denver's intention to appropriate the Colorado River water. Even though the posted and published notice did not explicitly link the proposed diversion to the Eagle-Colorado Reservoir, we consider it adequate under the circumstances here to charge others with inquiry notice of the extent of proposed use and the consequent demand on the water supply. Without the posting and publication, the work begun on the Eagle-Colorado Reservoir could not have constituted the initiation of the appropriation from the Colorado River because of a lack of any notice to interested persons

that the work in one drainage basin would lead to an appropriation in another, as discussed above in connection with the Piney River Unit of the Roberts Tunnel Collection System. *See Denver v. Northern Colorado Water Conservancy District,* 130 Colo. at 390, 276 P.2d at 1000.

On the other hand, the posting of the signs and publication of the legal notices alone could not have constituted the initiation of the appropriation because this action was simply not substantial enough to show that Denver was serious in pursuing an appropriation. However, when reviewing the evidence in the record as a whole, we conclude that Denver formed the necessary intent, and performed the requisite overt acts manifesting that intent, demonstrating that a substantial step had been taken toward the application of water to beneficial use, and providing notice to interested parties, as of November 30, 1971. In the statement of claim filed on that date, Denver completed the necessary overt acts by manifesting fully the requisite intent. *See Aspen v. Colorado River Water Conservation District; Fruitland Irrigation Co. v. Kruemling.*[17]

In conclusion, we reverse the water court and hold that Denver formed the necessary intent, subject to the resolution of the issue discussed in part V below, and performed the requisite overt acts to initiate the appropriation for the Colorado River Unit of the Eagle-Colorado Collection System as of November 30, 1971.

**17.** A comparison with the analysis of the Piney River Unit of the Roberts Tunnel Collection System, which led to a contrary result, may be instructive. Concerning the Piney River Unit, the survey work begun by Denver in November of 1956 on the Straight Creek Conduit and the East Gore Range Canal was not and could never be the initiation of the appropriation of water from the Piney River Unit. Whether the Straight Creek Conduit and the East Gore Range Canal are ever constructed is irrelevant to the Piney River appropriations. Performing work on these Blue River diversion and transportation conduits could not further the Piney River appropriations in any way, much in the same way as any work performed on the Eagle River pump diversion point for the Eagle-Colorado Collection System would not have initiated or furthered the appropriation from the Colorado River.

## V.

After the referee issued his partial report in 1978, this court decided *Colorado River Water Conservation District v. Vidler Tunnel Water Co.,* 197 Colo. 413, 594 P.2d 566 (1979) (*Vidler*). The Vidler Tunnel Water Company, a private corporation, sought a conditional storage decree for a reservoir that was part of a planned transmountain diversion and storage project. The company employed professional engineers, aerial photographers, surveyors and attorneys to define the size and location of the reservoir and to determine the availability of water for storage. Vidler planned to sell most of the water to municipalities on the eastern slope for general municipal use. However, Vidler had not yet entered into any contracts with municipalities or any other persons or entities to supply this water. 197 Colo. at 415–16, 594 P.2d at 566–67. We held that, in the absence of firm contractual commitments for the use of the water not intended for use by Vidler on its own land, and in the absence of any agency relationship between Vidler and the intended users, Vidler had not formed and, as a matter of law, could not form the necessary intent to appropriate water to apply to beneficial use. 197 Colo. at 417–18, 594 P.2d at 568–69. We elaborated further:

> Our constitution guarantees a right to appropriate, not a right to speculate. The right to appropriate is for *use*, not merely for profit. As we read our con-

In the case of the Piney River Unit, substantial work that had been performed by Denver on the Vail Pass Tunnel in 1957 could have served to demonstrate a substantial step toward application of waters of the Piney River Unit to beneficial use as of that date, for the Vail Pass Tunnel had to be designed to accommodate the waters from the Piney River Unit. However, the Vail Pass Tunnel work did not serve the overt act requirement's vital function of giving notice that the Piney River appropriations were contemplated and were being initiated by Denver. Contrast that to the Colorado River Unit of the Eagle-Colorado Collection System, where work on the Eagle-Colorado Reservoir constituted a substantial step that was necessary for the appropriation of water from the Colorado River, *and* sufficient notice was provided to others of the nature and extent of Denver's claims by the additional acts of posting and publication.

stitution and statutes, they give no one the right to preempt the development potential of water for the anticipated future use of *others* not in privity of contract, or in any agency relationship, with the developer regarding that use. To recognize conditional decrees grounded on no interest beyond a desire to obtain water for sale would—as a practical matter—discourage those who have need and use for the water from developing it. Moreover, such a rule would encourage those with vast monetary resources to monopolize, for personal profit rather than for beneficial use, whatever unappropriated water remains.

. . . . .

While Vidler's efforts possibly went beyond mere speculation, there was no sufficient evidence that it represented anyone committed to actual beneficial use of the water not intended for use on its own land. Indeed, there is not even evidence of firm sale arrangements. *In essence, water rights are sought here on the assumption that growing population will produce a general need for more water in the future.* But Vidler has no contract or agency relationship justifying its claim to represent those whose future needs are asserted.

197 Colo. at 417–18, 594 P.2d at 568–69 ("use" and "others" emphasized in original; other emphasis added; footnote omitted). *See also Lionelle v. Southeastern Colorado Water Conservancy District,* 676 P.2d 1162, 1168–70 (Colo.1984); *Rocky Mountain Power Co. v. Colorado River Water Conservation District,* 646 P.2d 383, 387–90 (Colo.1982). In *Rocky Mountain Power Co. v. Colorado River Water Conservation District,* we characterized our holding in *Vidler* as merely an application of longstanding principles of Colorado water law, not as the articulation of a new legal requirement. 646 P.2d at 389.

The record in this case discloses only that, over the years, Denver has entered into essentially open-ended leases with municipalities and private water distributors in the Denver metropolitan area to supply as much water as Denver can to those living or engaged in business or other activities, now or in the future, within each lessee's service area. It may be that all of the water Denver claims to have appropriated here, and which it intends to provide to users outside its boundaries, will be necessary solely to fulfill the contractual commitments in existence at the time Denver claims to have initiated these appropriations. However, we cannot confidently reach this conclusion on the record before us. The record discloses only that Denver, like the claimant in *Vidler,* seeks water rights on the assumption that growing population will produce a general need for more water in the future.

▬ Since, under *Vidler,* Denver could not have formed the necessary intent to appropriate any particular amount of water for use until it had plans to use that water within its own boundaries, firm contractual commitments to supply that water to users outside its boundaries, or agency relationships with such users, evidence must be taken and a finding made as to the amount of the claimed water, if any, that is committed by contract or agency agreement and on what dates those commitments came into existence. Therefore, we remand this case to the water court for proceedings consistent with the views expressed here and in *Vidler.*[18]

The referee and the water court did not find it necessary to consider Denver's storage right claims individually because of the denial of the direct flow claims upon which the need for storage was based. Should the court determine on remand that any of Denver's direct flow conditional water right claims have been established, it must

---

**18.** We recognize that the determination by the water court to adopt the referee's report and deny Denver's claims occurred in 1981, two years after *Vidler* was adopted by this court. However, there is no evidence that the water court considered *Vidler,* or its application to the

facts of this case, and neither the parties nor the amici curiae addressed this issue before the water court. Only in certain briefs filed before this court, during oral argument, and in supplemental briefs filed thereafter was the applicability of *Vidler* considered. Therefore, we are per-

then consider the relevant applications for storage rights, giving effect to the holdings contained in this opinion. The referee also concluded that there could be no finding of due diligence with respect to any of Denver's claims as Denver never initiated any conditional appropriations because of the failure to form the necessary intent. The water court adopted this conclusion. If, on remand, the water court becomes satisfied that Denver did initiate any appropriations, the court must consider whether Denver has diligently pursued the development of these claimed appropriations in order to resolve whether Denver has established the right to a decree recognizing conditional water rights.

## CONCLUSION

For the foregoing reasons, we reverse in part and affirm in part the water court's judgment and remand to that court for further proceedings consistent with this opinion.

suaded that a remand for consideration of the effect of *Vidler,* and the taking of evidence if necessary, is the proper course to adopt.